IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

CASE NO. _____

|  |  |
|---|---|
| SREENIVASAN ASOKAN, CHAKRAVARTHY RAGHAVAN, NANNI PIDIKITI, RAKESH PAREKH, RAM REDDY, MADHUBALA REDDY, and RODGER LODGE,<br><br>Plaintiffs,<br><br>vs.<br><br>AMERICAN GENERAL LIFE INSURANCE COMPANY, a Texas company and subsidiary of American International Group, Inc. ("AIG"); and Does 1-50,<br><br>Defendant(s). | **COMPLAINT FOR DAMAGES FOR:**<br><br>1. **RESCISSION;**<br>2. **VIOLATIONS OF THE RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT, FLA. STAT. §§ 895.01-895.06, et seq.**<br>3. **VIOLATIONS OF FLORIDA'S UNFAIR COMPETITION LAW;**<br>4. **MISLEADING ADVERTISING;**<br>5. **FRAUD BY CONCEALMENT;**<br>6. **FRAUD;**<br>7. **AIDING AND ABETTING;**<br>8. **VIOLATIONS OF § 501 PART II FLORIDA STATUTES DECEPTIVE AND UNFAIR ACTS OR PRACTICES;**<br>9. **BREACH OF FIDUCIARY DUTY;**<br>10. **CONSTRUCTIVE FRAUD;**<br>11. **NEGLIGENT MISREPRESENTATION;**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiffs, SREENIVASAN ASOKAN ("Asokan"),
CHAKRAVARTHY RAGHAVAN ("Raghavan"), NANNI PIDIKITI ("Pidikitti"),
RAKESH PAREKH ("Parekh"), and RAM REDDY and MADHUBALA REDDY
("Reddy") (collectively referred to as "Plaintiffs"), on behalf of themselves and all
other similarly situated entities and/or individuals, and sues Defendant
AMERICAN GENERAL LIFE INSURANCE COMPANY, a Texas company

("AIG") and registered to do business in Florida since 1961, and Does 1-50 (collectively and with the DOES, "Defendants"). Plaintiffs believe that evidentiary support exists for the allegations set forth herein below upon a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.    This is an action for damages in excess of fifteen thousand and no/100 dollars ($15,000.00), exclusive of attorneys' fees and costs, on behalf of Plaintiffs who invested money with the Defendants.

2.    Venue is proper in Orange County under Florida Statute §47.051 because the statutory violations, and wrongful and/or negligent actions alleged herein occurred in Orange County, and residents of Orange County purchased securities from the Defendants in Orange County, Florida.

3.    Defendants are subject to long-arm jurisdiction in this state under Florida Statute §48.193 (2009) and §626.906 because Defendants operate, conduct, and carry on business within the State of Florida, and have committed tortious acts which cause injury in Florida are sufficient for personal jurisdiction under Florida Statute §48.193 for the Defendants' acts of (1) soliciting business in Florida, (2) advertising, promoting, and selling their product and/or service and giving advice in Florida, (3) breaching their duties to, and contracts with, Florida residents, (4) committing tortious acts within the State of Florida, and (5) causing injury to persons and property within the State of Florida.

## INTRODUCTION

4.    Defendants have organized, promoted, administered, and sold rights to participate in Voluntary Employee Beneficiary Association Plans that purported

to offer the owners of small, closely-held businesses an insurance-oriented welfare benefit with tax advantages. (As used herein, the terms "VEBA plan(s)" or "plan(s)" refer to voluntary employee beneficiary associations generally and the terms "VEBA Program(s)" or "Program(s)" refer to the plans established, promoted and administered by Defendants.) An integral part of these VEBA Programs are specialized whole life insurance policies that, when purchased and initially owned through a VEBA Program and then later exchanged for another policy, supposedly allowed these small business owners to make tax-deductible premium payments and, at later dates, withdraw funds on a tax-free basis ("Policies" or "Policy").

5.      The Internal Revenue Service ("IRS") has ruled that VEBA plans like the ones Defendants established, promoted and administered do not comply with federal tax law, determinations that have been consistently upheld by federal courts. At all relevant times, Defendants were well aware of the noncompliant nature of their Programs. Litigation involving prior versions of the VEBA Programs at issue here and determinations by the IRS put Defendants on notice that their Programs are an unlawful tax avoidance scheme. Nonetheless, Defendants continued to promote, administer, and sell participation rights in their VEBA Programs, and further continued to market and sell the accompanying Policies. In January 2004, tax attorneys retained by Defendants issued an opinion letter advising them that their VEBA Programs did not did not comply with Internal Revenue Code ("I.R.C.") § 419A(f)(6), the relevant provision of the Tax Code that supposedly permitted the tax-deductible contributions and the tax-free withdrawals ("§ 419A(f)(6)"). In 2013, the U.S. Department of Justice ("DOJ")

filed a civil action in the Central District of California (Case 8:13-cv-01582-JLS-JPR) to enjoin Defendants' agents from continuing to market and sell these Programs.

6.    Plaintiffs later discovered that Defendants failed to disclose:

a.    The IRS has deemed VEBA plans like Defendants' Programs to be suspect "Listed Transactions," or in other words, transactions that are the same or substantially similar to ones that the IRS has determined to be illegal tax avoidance schemes. The IRS imposes significant penalties on those who participate in Listed Transactions without disclosing that fact to the IRS.

b.    Contrary to Defendants' representations, the "contributions" that Participants make to the Programs where simply life insurance premium payments routed through the Program, were not tax-deductible as represented.

c.    Defendants' claims that Participants could withdraw funds on a tax-free basis are false. The IRS considers the features of these Programs that supposedly allowed Participants to withdraw funds on a tax-free basis to be a deferred compensation scheme subject to taxation.

d.    With their high fees and low cash values, the Policies have few advantages once stripped of their supposed tax advantages.

7.    In 2006 – more than two years after tax attorneys advised Defendants that these Programs did not comply with federal tax law – Defendants reached out to their agents and financial planners to convince them to have their VEBA clients participate in Defendants' VEBA Programs. Defendants, including a senior AIG executive, told the financial adviser that, if his clients joined one of Defendants' VEBA Programs and purchased the related Policies, their premium payments

-4-

would be tax deductible and they would be allowed to withdraw funds on a tax-free basis at a later date. When Plaintiffs' financial planners raised questions about earlier IRS actions against such plans and inquired whether they were Listed Transactions, Defendants assured him that their VEBA Programs had been vetted by counsel and complied with § 419A(f)(6) and all other provisions of law. Defendants also provided him with opinion letters from tax attorneys and an IRS determination letter to that effect. But Defendants concealed the January 2004 opinion letter that concluded Defendants' Programs did not comply with § 419A(f)(6).

8.     Plaintiffs' financial adviser(s) relayed Defendants' false claims about their VEBA Programs to Plaintiffs. Since they had no knowledge of the January 2004 improperly withheld opinion letter, Plaintiffs financial planner was unable to warn Plaintiffs that the supposed tax advantages were illusory, or that participation in one of Defendants' Programs would likely result in an IRS audit and the imposition of penalties. In this fashion, Defendants persuaded Plaintiffs to join one of their Programs and purchase three Policies from Defendant AIG.

9.     In late 2011 and early 2012, after Plaintiffs paid significant monetary contributions to the Program they joined, which were to be used to pay the premiums on the Policies, the IRS audited Plaintiffs and ultimately issued assessments for penalties, interest, and back taxes.

10.     Using similar methods and a common marketing plan, Defendants convinced dozens of other entities and individuals to join their Programs and purchase AIG Policies as documented in the DOJ complaint and other cases filed against Defendants herein. The various Programs were essentially identical,

although established in the names of different associations.

11.    Defendants knew, or should have known, that their Programs did not comply with § 419A(f)(6) and related regulations, that the IRS would audit and impose penalties on the Plaintiffs for deducting the premium payments they paid for the Policies, and that the Plaintiffs would not be able to withdraw benefits on a tax-free basis.

12.    Defendants have violated the Florida's Racketeer Influenced and Corrupt Organization Act, Fla. Stat. 627.401, et seq. ("RICO"), as well as Florida's Deceptive and Unfair Trade Practices Act, Florida Statutes § 501.201 et seq. (collectively, "FDUPTA").    They also committed fraud by concealment, and common law fraud.

13.    Plaintiffs are entitled to rescind all transactions with Defendants, whether Defendants' material misstatements and failure to disclose material information were intentional, negligent, or even just the result of a simple mistake. Plaintiffs are entitled to recoup not only their contributions/premiums and related fees, but also consequential damages, including back taxes, interest and penalties, the loss of the time value of their money, and future tax liabilities that they would not otherwise have incurred.

14.    Defendant AIG worked closely with their agents on these Programs since 2001 or 2002, supplied some of the most critical marketing materials used to market these Programs, and sold many Policies. At all relevant times, AIG knew that Plaintiffs were induced by Defendants' conduct to believe that purchasing these Policies through a VEBA Program provided the significant tax advantages described elsewhere in this Complaint.

15.    AIG is responsible for the wrongful or negligent conduct of its employees (including Peter Mordin and David Robinson), its designated agents - including Innovative Private Strategies & Insurance Services, Inc. ("Innovative"), Laban Pattanaik ("Laban"), Lalat Pattanaik ("Lalat") and Kenneth Elliott ("Elliott") - and those who are AIG's agents by operation of law - including Innovative, Laban, Lalat, Elliott, I.P.S. Private Advisors, LLC ("IPS") and Sea Nine Associates, Inc. ("Sea Nine"). See Fla. Stat. §§ 626.221, 626.311, et seq. Further, Defendant AIG is responsible for the materially false and incomplete information that financial advisers obtained from Defendants and innocently relayed to Plaintiffs.

<u>PLAINTIFFS</u>

16.    Plaintiff Sreenivasan Asokan, M.D. ("Asokan") is a resident of Orange County, Florida, and a shareholder and President of Independent Anesthesia Services, P.A., a Florida corporation with a principal place of business in Orange County, Florida. At Defendants' urging, Asokan joined a VEBA Program established in the name of Independent Anesthesia Services, P.A. ("IAS"), and thus became a "Participating Employer" in that Program pursuant to an Adoption Agreement described below, and Asokan became a "Participating Employee" in the VEBA Master Plan and Master Trust under the Southern California Medical Profession Association pursuant to the Adoption Agreement. Asokan is the named Insured of the Policy No. A1E050082C issued by Defendant AIG.

17.    Plaintiff Chakravarthy Raghavan, M.D. ("Raghavan") is a resident of Orange County, Florida, a shareholder and principal of C. Raghavan, M.D., P.A., a

Florida corporation with its principal place of business in Orange County, Florida. At Defendants' urging, Raghavan joined a VEBA Program established in the name of C. Raghavan, M.D., P.A. ("CRMP"), and thus became a "Participating Employer" in that Program pursuant to an Adoption Agreement described below, and Raghavan became a "Participating Employee" in the VEBA Master Plan and Master Trust under the Southern California Medical Profession Association pursuant to the Adoption Agreement. Raghavan is the named Insured of the Policy Nos. A1E050023C and A10221980C issued by Defendant AIG.

18.    Plaintiff Nanni Pidikiti, M.D. ("Pidikiti") is a resident of Alcorn County, Mississippi, a shareholder and principal of Nanni Pidikiti, M.D., P.C., a Mississippi corporation with its principal place of business in Alcorn County, Mississippi ("NPMP").  At Defendants' urging, Pidikiti joined a VEBA Program established in the name of Nanni Pidikiti, M.D., P.C. ("NPMD"), and thus became a "Participating Employer" in that Program pursuant to an Adoption Agreement described below, and Pidikiti became a "Participating Employee" in the VEBA Master Plan and Master Trust under the Southern California Medical Profession Association pursuant to the Adoption Agreement. Pidikiti is the named Insured of the Policy No. A10222477C issued by Defendant AIG.

19.    Plaintiff Rakesh S. Parekh, M.D. ("Parekh") is a resident of Seminole County, Florida, a shareholder and principal of Rakesh S. Parekh, M.D., P.A., a Florida corporation with its principal place of business in Seminole County, Florida.  At Defendants' urging, Parekh joined a VEBA Program established in the name of Rakesh S. Parekh, M.D., P.A. ("RPMP"), and thus became a "Participating Employer" in that Program pursuant to an Adoption Agreement

described below, and Parekh became a "Participating Employee" in the VEBA Master Plan and Master Trust under the Southern California Medical Profession Association pursuant to the Adoption Agreement. Parekh is the named Insured of the Policy No. A1E050071C issued by Defendant AIG.

20.    Plaintiffs Ram Reddy, M.D. ("R. Reddy") and his wife Madhubala Reddy, M.D., ("M. Reddy") are residents of Orange County, Florida, and maintain their principal place of business in Orange County, Florida.  At Defendants' urging, R. Reddy and M. Reddy joined a VEBA Program established in their names Ram Reddy and Madhubala Reddy and thus became a "Participating Employer" in that Program pursuant to an Adoption Agreement described below, and R. Reddy and M. Reddy became "Participating Employees" in the VEBA Master Plan and Master Trust under the Southern California Medical Profession Association pursuant to the Adoption Agreement.  R. Reddy is the named Insured of the Policy No. A10221980C issued by Defendant AIG and M. Reddy is the named Insured of the Policy No. A10207835C.

21.    Plaintiff Rodger Lodge ("Lodge") is a resident of Los Angeles County, California. At Defendants' urging, Lodge joined a VEBA Program and pursuant to an Adoption Agreement described below, Lodge became a "Participating Employee" in the VEBA Program pursuant to the Adoption Agreement. Lodge is the named Insured of the Policy No. A10207866C issued by Defendant AIG.

<u>NON-PARTY ENTITIES AND INDIVIDUALS</u>

22.    The SCMAPL (a.k.a. Southern California Manufacturing and Producers' League) is the "sponsor" of a VEBA Program that Defendants

established and administered and that Plaintiffs joined, and acted as an agent, representative or employee of Defendants.

23.    From 2007 to the present, Comerica Bank has served as the Trustee of a trust established to hold the assets of Defendants' Programs and served as the Programs' "funding mechanism." On information and belief, all of Comerica's activities were directed by Defendants and Comerica did not act in the absence of instructions from Defendants, and acted as an agent, representative or employee of Defendants.

24.    R. Wesley Sierk, III ACI, ARM, ChFC, a principal at Pine Avenue Partners, LLC ("Sierk"), provided information and marketing material to Plaintiffs' agents and financial planners and was Plaintiffs' financial planner. As alleged more fully elsewhere, Defendants communicated false and misleadingly incomplete information to Sierk who innocently relayed that false and misleadingly incomplete information to Plaintiffs, and acted as an agent, representative or employee of Defendants.

25.    At all relevant times, Royce Imhoff ("Imhoff") held senior executive positions at Defendant AIG, including President of Independent Distribution, and provided information and marketing material to Plaintiffs' agents and financial planners.  Imhoff acted as an agent, representative or employee of Defendants, and acted as an agent, representative or employee of Defendants.

26.    At all relevant times, David Robinson ("Robinson") held senior executive positions at Defendant AIG, including senior counsel to AIG and later head of advance sales in the Affluent and Corporate Markets Group, and provided information and marketing material to Plaintiffs' agents and financial planners.

Robinson acted as an agent, representative or employee of Defendants.

27.    On information and belief, Peter Mordin is an individual residing in Orange County, California who, at all relevant times, held senior positions with Defendant AIG, including National Marketing Director and Regional Vice President, and provided information and marketing material to Plaintiffs' agents and financial planners.  Mordin acted as an agent, representative or employee of Defendants.

28.    Sea Nine Associates, Inc. is a Nevada corporation whose status with the California Secretary of State is now listed as "FTB Suspended".  At all relevant times, Sea Nine served as the Administrator or de facto Administrator for the Programs and was responsible for operating them and directing their activities, and provided information and marketing material to Plaintiffs' agents and financial planners.  Sea Nine Associates, Inc. acted as an agent, representative or employee of Defendants.

29.    Kenneth Elliott, individually and d.b.a. KAE, KAE Consulting and Vista Barranca, is an individual residing in Orange County, California. Plaintiffs are informed and believe that, at all relevant times, Elliott was an employee of Defendant Sea Nine and an agent for AIG, and provided information and marketing material to Plaintiffs' agents and financial planners.  Elliot acted as an agent, representative or employee of Defendants.

30.    Lalat Pattanaik ("Lalat") and Laban Pattanaik ("Laban") are brothers residing, on information and belief, in the State of California, County of Los Angeles, and provided information and marketing material to Plaintiffs' agents and financial planners.  Lalat and Laban acted as agents, representatives or employees

of the Defendants.

31.    Innovative Private Strategies & Insurance Services, Inc. is a California corporation whose status with the California Secretary of State is now listed as "FTB Suspended" and, thus, lacks the capacity to defend itself in this action. Cal. Rev. & Tax Code § 23301. At all relevant times, Defendant Laban was the sole owner, shareholder, director and/or principal of Innovative and was solely responsible for directing all of Innovative's affairs and provided information and marketing material to Plaintiffs' agents and financial planners.  Innovative acted as an agent, representative or employee of Defendants.

32.    I.P.S. Private Advisors LLC is a California limited liability company with its principal place of business in Laguna Hills, California and, on information and belief, is equally owned and controlled by Lalat and his brother, Laban. Defendants Innovative and Laban retained Defendant IPS to market Defendants' VEBA Programs, and provided information and marketing material to Plaintiffs' agents and financial planners.   IPS acted as an agent, representative or employee of Defendants.

33.    Steve Ruff ("Ruff") was a financial planner for Plaintiffs at all times material hereto, and is a resident of Orange County, Florida, and provided information and marketing material from the Defendants to the Plaintiffs.  Ruff assisted Plaintiffs in completing applications and acted as an agent, representative or employee of Defendants.

34.    Sea Nine, Elliott, Innovative, Laban, IPS, Lalat, and Ruff are collectively referred to herein as the "Agents" having been provided information and marketing materials from the Defendants and furnishing the same to the

Plaintiffs, Plaintiffs' agents, and/or financial planners, thus acting as agents, representatives or employees of the Defendants.  The Agents had actual and apparent authority from the Defendants and the Plaintiffs believed they were dealing with AIG or person authorized to act for AIG.

DEFENDANTS

35.    Defendant American General Life Insurance Company is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Houston, Texas and is one of several marketing names for the insurance companies and affiliates comprising the domestic life operations of American International Group, Inc. ("AIG") which issues life insurance policies and annuities in Florida to Plaintiffs.  AIG is a foreign for-profit corporation registered to do business in Florida. As more fully alleged elsewhere in this Complaint, AIG specifically designed the Policies to be sold in conjunction with the VEBA Programs that Defendants developed and promoted (including the SCMAPL Program) and took a leading role in marketing and selling not only the Policies, but also participation in the noncompliant VEBA Programs.  AIG also used American General Financial Group as a marketing name for AIG, as well as AIG.com and AIG Life and Retirement.

36.    The true names and capacities of the Defendants, DOES 1 through 50, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs at the time of filing this Complaint and Plaintiffs, therefore, sue said Defendants by such fictitious names and will ask leave of court to amend this Complaint to show the true names or capacities of the DOES when the same have been ascertained. Plaintiffs are informed and believe, and therefore allege, that each of the DOE

Defendants is, in some manner, responsible for the events and happenings herein set forth and proximately caused injury and damages to Plaintiffs as herein alleged.

<u>VICARIOUS LIABILITY ALLEGATIONS</u>

37.    Plaintiffs are informed and believe, and on that basis allege, that each Defendant named in this action, including each of the DOE defendants, was the agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate of each of the other Defendants, and was at all times relevant herein acting within the course and scope of his, her or its authority as agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate, and with the knowledge, authorization, consent, permission, and/or ratification of the other Defendants. On information and belief, all actions of each Defendant alleged herein were ratified and approved by the officers and/or managing agents of each other Defendant, whether DOE or otherwise.

38.    At various times prior to the marketing and sale of the Policies to Plaintiffs, AIG filed "Notices of Agency Appointment" with the California Department of Insurance designating Defendants Innovative, Laban, and Elliott as agents of AIG. See Cal. Ins. Code § 1704. These Agents thereby became "life licensees" authorized to sell Policies on behalf of AIG. Cal. Ins. Code §§ 32(a); 1622(a). Further, Innovative and Laban became Master General Agents (a.k.a. "Level 7 Master General Agents") of AIG pursuant to a contract dated February 17, 2004. Under California law, Defendant AIG is thus liable for these and all Agents' material misstatements to Plaintiffs (directly and through Sierk and others) and failure to disclose material information to Plaintiffs (directly and through Sierk

-14-

and others).

39.    The Agents jointly presented a proposal for the Policies to Plaintiffs on behalf of Defendant AIG, jointly transmitted applications for those Policies to AIG, and/or received commission payments from AIG. Pursuant to California Insurance Code § 1704.5, when Defendant AIG issued the Policies pursuant to the aforementioned proposal and transmittal and/or paid commissions to the Agents, it became liable for: (a) the material falsehoods, negligent or otherwise, communicated by the Agents to Plaintiffs; (b) the failure of Defendants to disclose material information to Plaintiffs; (c) the Agents' innocent re-conveyance of materially false information from Defendants to Plaintiffs; and (d) the Agents' innocent failure to disclose the material information that these Defendants failed to disclose to the Agents.

40.    Because Defendant AIG knew that its Policies were purchased in conjunction with VEBA Programs, participated in a unified marketing scheme that promoted both its Policies and the Programs, and understood all of the details relating to those Programs, all of the conduct of the Agents alleged in this Complaint was within the course and scope of the agency relationship(s) between AIG and the other Defendants.

41.    Defendant AIG is also responsible for the wrongful acts and omissions of its Agents and employees Imhoff, Robinson, and Mordin and other Agents under the doctrine of respondeat superior.

<u>GENERAL ALLEGATIONS</u>

A.    <u>The Common Characteristics and Tax Advantages of §419A(f)(6) Plans</u>

42.    A VEBA plan that complies with § 419A(f)(6) involves the creation

of a joint trust or other fund that ten or more companies join. Those companies make tax-deductible contributions to this common trust or fund which, in turn, uses those contributions to purchase insurance contracts and other assets which provide welfare benefits – usually and in this case only life insurance – to certain of the participating companies' employees. A trustee (often a bank or other financial institution) typically takes formal ownership of the insurance policies purchased by the plan and conducts the day-to-day operations.

43.    Ordinarily, if a company purchases a standard term life insurance policy for an employee, the premium payments would be included as part of the employee's gross income, and therefore taxable (to the employee). See 26 C.F.R. § 1.61-2(d)(ii)(A). But if the company joins a properly established multiple-employer welfare benefit plan under § 419A(f)(6), its contributions to the plan are deductible (to the company), and the plan may use those contributions to purchase the same life insurance policy. In other words, premiums paid in the first case are not tax deductible while contributions (used to buy the exact same policy) in the second case are tax deductible. This makes a § 419A(f)(6)-compliant plan attractive.

B.    Defendants' VEBA Programs

44.    Defendants' VEBA Programs consist of a series of "Master Plan Documents" drafted by Defendants and a trust established by Defendants to hold the assets of the Program and serve as the "funding mechanism." The Master Plan Documents include the following: (a) "Master Plan" and "Master Trust" documents to establish the entity of ten or more employers required for a § 419A(f)(6) plan; (b) "Adoption Agreements" that the small businesses targeted by

Defendants would sign to join the Program; and (c) "Summary Plan Descriptions" that such Participating Employers could issue to their eligible employees.

45.    The following summary is helpful to understand Defendants' VEBA Programs and the facts alleged herein:

a.    First, there is the "Sponsor," an association of employers in whose name the VEBA Program is established. SCMAPL was one such association. Each VEBA Program was organized, promoted, administered, and operated by Defendants, without any material involvement by the Sponsor.

b.    Second, the small businesses persuaded to adopt one of Defendants' VEBA Program are known as the "Participating Employers" and their eligible employees who elected to participate – usually the owners of a closely held business – are referred to as "Participating Employees" (collectively, "Participants"). The Plaintiffs' small business medical practices are the Participating Employers and the individual Plaintiffs are the Participating Employees.

c.    Third, there is the "Insurer" who issues the Policies. In this case, the Insurer is Defendant AIG, which marketed and sold Policies to Plaintiffs.

d.    Fourth, there are the "Insureds." In practice, these are the individuals defined above as Participating Employees – the owners of the small businesses that joined Defendants' VEBA Programs. Plaintiffs Asokan, Raghavan, Pidikiti, Parekh, R. Reddy, M. Reddy, and Lodge are Insureds.

e.    Fifth, each VEBA Program has a designated or de facto "Administrator" responsible for directing the affairs of the Program. Sea Nine and Elliott served as the Administrator for all Programs.

f.      Finally, there is the "Trustee" responsible for holding the assets entrusted to the Program and processing the required financial transactions as directed by Defendants (e.g., receiving "contributions" or in other words premium payments from Plaintiffs, and the payment of those premiums to the Insurer, etc.). In 2007, Sea Nine and/or Elliott retained Comerica to serve as Trustee for its Programs.

46.     The Master Plan Documents provided that a "Master Committee" would determine the kind of insurance policies to be purchased with the contributions, and be responsible for all related issues, such as the payment of benefits under the plan. In reality, the designated or de facto Administer (Sea Nine and Elliott) made all relevant decisions and directed all of the Trustee's actions.

47.     The Master Plan Documents specified: (a) the eligibility requirements for Participants; (b) when and how Participating Employers were to make their contributions; (c) the nature of the insurance benefit to be provided by the Program, which was always life insurance; and (d) the conditions under which Participating Employers could terminate participation and thereby provide the Participating Employees the opportunity to take personal ownership of the life insurance policies.

48.     According to the DOJ complaint, these Master Plan Documents are "largely identical." In 2009, Defendants prepared a new set of Master Plan Documents that purportedly brought Defendants' VEBA Programs into compliance with § 419A(f)(6) but (a) according to the DOJ, the 2009 versions do not remedy the deficiencies, and (b) in any event, they were never implemented because none of the victims, Plaintiffs included, adopted them. In short, none of

the Master Plan Documents complied with § 419A(f)(6) and related regulations, and so Participating Employers were not entitled to deduct their contributions as represented. To the contrary, these were Listed Transactions that Participants were required to disclose to the IRS or pay a penalty.

C.    Defendant AIG's Involvement In The Scheme

49.    Defendant AIG sold many Policies in conjunction with these VEBA Programs and had been working closely with the Agents since 2001 or 2002. On an ongoing basis, the Agents had extensive discussions with high-level executives at AIG, including Imhoff (AIG's President of the Independent Distribution), Robinson (who held various senior executive positions, including senior counsel to AIG and later head of advance sales in the Affluent and Corporate Markets Group), and Mordin.[1]

50.    Lalat and Laban and their staff at IPS met regularly with Mordin. In or around August 2002 or 2003, Mordin introduced Robinson to Lalat and IPS. Thereafter, Robinson was in regular communication with the Agents about the VEBA Programs. AIG was aware that Elliott was involved in the administration of the VEBA Programs and directly communication with him regarding the Programs.

51.    AIG, Robinson, and Mordin were not only aware of and never objected to the Agents' marketing strategy for the VEBA Programs, but also they allowed the Agents to use AIG-generated marketing materials and software in this marketing. Defendant AIG provided an advisors guide, which included a section

---

[1] Lalat also had discussions with Dennis Roberts, who was President of AIG's Independent Agency Group; Larry O' Brien, who was a Senior Vice President and Chief Marketing Officer; and Rodney Martin, who was the head of AIG life insurance worldwide.

on VEBA plans. AIG also provided the Agents with numerous other marketing publications for VEBA plans.

52.    Defendant AIG provided marketing material to the Agents with the knowledge and intent that the Agents would transmit that material to Plaintiffs and others using the U.S. Mail and/or e-mail transmitted across interstate wires. AIG knew or should have known that this marketing would be used in conjunction with the fraudulent marketing of Defendants' VEBA Programs and the sale of Policies through those Programs. AIG knew or should have known that this marketing material was materially false and/or misleading when so used.

D.    Defendants' VEBA Programs Violate Restrictions On § 419A(f)(6) Plans

53.    There is a long history of companies misusing VEBA plans as tax avoidance schemes. There are rules to prevent such abuse. For example, if a participating corporation claims a deduction for contributions actually used to distribute corporate earnings to the corporation's shareholders, the deduction will be disallowed because such contributions are not an "ordinary and necessary" business expense within the meaning of I.R.C. § 162. Second, a company cannot deduct a contribution to a welfare benefit plan in the year made if the benefits provided constitute deferred compensation as defined in IRC § 404. See I.R.C. § 419(e)(2). Rather, the deduction must be deferred until the employee includes the compensation in his or her gross income. I.R.C. § 404(a)(5).

54.    Defendants and their Agents represented that their VEBA Programs, including the SCMAPL Program, strictly complied with § 419A(f)(6) and all related rules and regulations. In fact, these Programs were noncompliant, as Defendants knew. The contributions Participating Employers made to the

Programs for purchase of the Policies far exceeded the actual cost of the primary "welfare benefit" claimed to be the aim of the VEBA Program – the death benefit derived from a life insurance policy; the same death benefit could be purchased for much less money. The amounts above the true cost of the death benefit were used to obtain the cash value portion of the Policies and, in effect, set aside those excess payments for the benefit of the owners of the companies.

55.    In other words, Defendants' VEBA Programs allowed the excess contributions to be used to pay premiums that mostly flowed through the accumulated cash values of these Policies, and then into the hands of the company owners. Thus, Defendants' VEBA Programs did not really provide a welfare benefit for Participants, but instead were mechanisms for distributing excess profits to owners and/or providing deferred compensation in a manner that avoided federal taxes.

56.    In 2013, the DOJ filed a civil action in U.S. District Court for the Central District of California (Case No. 13-CV-01582-JLS-JPR) against Sea Nine and Elliott to enjoin them from continuing to market and sell participation rights in Defendants' VEBA Programs because they do not comply with § 419(f)(6). As summarized in the DOJ complaint: "[T]he core purpose and effect of the participation in a Sea Nine VEBA plan is to provide participants with a mechanism to accumulate wealth for their personal benefit, unlawfully protecting that income from federal taxation by treating it as a welfare benefit plan when it was that in name only." Elliot entered into a stipulated order with the U.S. Attorneys' Office on September 3, 2014 in U.S. District Court for the Central District of California enjoining Elliot from directly or indirectly promoting, administering, managing,

marketing, or selling any version of the VEBA plans operated or administered by Sea Nine or similar to the VEBA plans operated or administered by Sea Nine.

57.    The IRS has audited numerous taxpayers who participated in one of Defendants' Programs and determined the taxpayer was liable back taxes and/or penalties. The total amount collected in these audits exceeds $13 million. The IRS knows of a total 205 Participants in these Programs and estimates that, when all audits are completed, its recovery could exceed $70,000,000.

E.    Defendants Knew, But Did Not Disclose, That Their VEBA Programs Were Noncompliant

58.    At all relevant times, Defendants knew, or in the exercise of ordinary care should have known, that their VEBA Programs were Listed Transactions and an unlawful tax avoidance scheme. For example, Sea Nine and Elliott were involved in early VEBA Programs promoted in the 1990s that led to determinations by the Tax Court that the Programs were an unlawful tax avoidance scheme. See, e.g., _Neonatology Assoc., P.A. v. Comm'r_, 229 F.3d 221 (3d Cir. 2002) (upholding one such Tax Court determination). At last one Participant from the 1990s sued Sea Nine and Elliott for RICO violations involving a pattern of racketeering activity almost identical to that allege herein. _Borah, et al. v. Monumental Life Insurance Company, et al._, U.S. District Court, E.D. Pa. Case No. 04-CV-03617-BMS, Dkt. No. 1 at ¶¶ 1, 16, 46-142 (RICO allegations in complaint filed July 30, 2004). Defendants, and each of them, knew from such experience that Plaintiffs would not obtain the claimed tax advantages and, in fact, would be forced to pay penalties, back taxes, and interest to the IRS as a result of their participation. Indeed, the following from the DOJ complaint applies with

equal force here:

59.    "Significantly, the Neonatology case involved the participants in a Sea Nine-sponsored and promoted VEBA plan – thus evidencing the Defendants' persistent promotion of the tax scheme at issue in this case despite knowledge of its potential illegality for over 10 years."

60.    As noted in the DOJ complaint, Sea Nine and Elliott continued to use the same Master Plan Documents after 2001 knowing that these documents did not comply with § 419A(f)(6) and that the results for early Participants were disastrous.

61.    In 2000, the IRS designated transactions like the VEBA Programs that Defendants marketed and sold as Listed Transactions. See IRS Notice 2000-15; see also IRS Notice 95-34. A Listed Transaction is a transaction that is the same as or substantially similar to one of the types of transaction that the IRS has determined to be a tax avoidance transaction, and must therefore be reported by participants to the IRS in accordance with specified regulations. I.R.C. § 6111(a) and (b); 26 C.F.R. § 1.6011-4. If not reported, the IRS imposes penalties on the taxpayer. Here, Defendants failed to disclose to Plaintiffs and the Agents that their VEBA Programs, including the SCMAPL Program, are Listed Transactions that must be disclosed to the IRS.

62.    Moreover, in 2003, the Treasury Department tightened the regulations applicable to plans that purport to be multiple-employer plans under § 419A(f)(6). 26 C.F.R. § 1.419A(f)(6)-1. Defendant AIG (acting through Robinson and Mordin) asked Lalat and Laban to demonstrate to AIG that their VEBA Programs complied with these newly tightened regulations and they had selected attorney Bruce

Ashton of the law firm of Reish Luftman Relcher & Cohen ("Reish") to conduct this review. That same month, Robinson e-mailed Lalat that AIG was placing Defendants' VEBA Programs on an updated list of acceptable plans for placement of insurance products but that he still needed to see the compliance documents by January 2004.

63.    By January 2004, the Reish firm had completed its review and prepared a draft opinion letter concluding that Defendants' VEBA Programs did not comply with the new regulations under § 419A(f)(6). Shortly thereafter, the Agents sent this draft opinion letter to AIG with a cover letter stating:

> "As you are aware, we have been developing a long-term alliance with AIG American General over the last 2+ years with the hopes of generating substantial business in the dynamic area of qualified multiple employer welfare benefit plans and eventually expanding the distribution channels for our plans with the assistance of the Affluent and Corporate Markets Group and its agents.  Because of our interest in a stable long-term strategic alliance with your group, we wanted you and your agents to be comfortable and supportive of our programs. In order to facilitate this, we decided to engage a major law firm ... whose opinions were highly regarded by AIG.... Consequently, because of our discussion with you and David Robinson ... we decided to engage Reish Luftman Relcher & Cohen ("Reish")—a firm that was already of counsel to your company ... As a result of the final 419 regulations which were released in 2003, we felt that Reish should evaluate the structure and operations of our programs in light of these regulations to ensure continued compliance. We also wanted them to reaffirm that we are a plan under ERISA as currently operated. Both of these items are very significant in sustaining the deductibility of employer contributions to our program. They are also critical to differentiating our programs from the non-qualified "419" plans which claim that they do not fall under the guidelines, and therefore do not have to meet such standards and restrictions.[] As you can see, Reish's opinion is to the contrary ... We have attached herewith the initial draft letter provided by Reish."

64.    The attached Reish law firm draft letter stated that Elliott, on behalf of Sea Nine, asked Reish "to address whether the several [VEBAs] administered by Sea Nine Associates conform to the requirements set forth in Treasury Regulations under Internal Revenue Code" or were exempt from those regulations. Reish first concluded that "[b]ecause the Plan and Trust do not contain provisions required under the new 419 Regulations, the VEBAs do not currently meet the requirements of the 419 Regulations." Reish also concluded that the VEBAs were not exempt from the regulations.

65.    These same conclusions were reflected in a final version of this opinion letter dated January 27, 2004. Reish made several suggestions to make these plans compliant, which the Defendants ultimately ignored.

66.    On January 30, 2004, IPS sent a letter to Mordin stating that in light of the opinion letter from Reish, the Agents would amend "[o]ur plan documents and some operational aspects of our program ... accordingly" and that the Agents would "notify [AIG] of the changes and make available the final documents resulting from their recommendations—when they become available." The letter also stated that IPS planned "on maintaining an "open book approach, and making transparent to your team, any structural, operational and documentation changes that Reish recommends." In fact, the Agents never followed through with these promises. Robinson has testified in another action that he warned Imhoff and Mordin that the Agents had not done so. But AIG took no further action to ensure compliance with federal tax law and continued to sell Policies, including to Plaintiffs.

67.    In    summary,    Defendants    knew    that    their    Programs    were

noncompliant. Yet Defendants continued to market their VEBA Programs and falsely represent to their Agents and Participants that (a) their Programs fully complied with federal tax law, (b) the Programs were not Listed Transactions requiring notice to the IRS, and (c) contributions were tax-deductible. Further, Defendant AIG continued to market and sell its Policies even after very senior executives, including Imhoff, Robinson and Mordin, knew that the VEBA Programs failed to comply with § 419A(f)(6) and related regulations.

F.    The Plaintiffs' Participation In A VEBA Program

68.    Defendants, using their Agents, promoted their VEBA Programs mostly to high-income professionals who own small, closely-held companies, such as the Plaintiffs.

69.    IPS e-mailed Agents a packet of marketing material as part of a common marketing plan. Attached to the e-mail was a lengthy description of VEBA plans prepared by IPS and trade association bulletins entitled "IRS Loses Major Case on Funding Welfare Benefits" and "IRS Rules that Employer May Deduct VEBA Contributions Used to Purchase Life Insurance." Also included was a document on IPS stationary that prominently displays the AIG logo, and includes the following representations:

70.    "IPS successfully identifies, structures and implements innovative programs that allow high net worth individuals to dramatically reduce their taxes and enhance their overall tax efficiency. [¶] Our team consists of in-house experienced professionals including MBAs, attorneys, and registered financial consultants. We also work closely with outside legal, actuarial and accounting experts, as well as the advanced planning divisions of major financial

institutions.... [¶] IPS has teamed with some of the strongest, and most well-respected global financial institutions to offer clients world-class ... advanced planning services. Over the past 25 years, IPS has developed relationships at the highest levels of these partner organizations.... Further, IPS works with some of the largest and most reputable law firms in the country to ensure that programs offered through IPS are structured properly.... [¶] Our high impact programs are backed and used by experienced law firms, actuarial firms, and accounting professionals. All of the programs offered by IPS have written Determination Letters from the IRS or written opinion by a major law firm(s) [sic.] with expertise in the area of law opined on.... [¶] Our Welfare Benefit Trust Programs can provide your business or practice a substantial tax deduction into an IRS-qualified plan, while providing tax-favored benefits for you and any eligible employees. A few of the key benefits of adopting a WBT are: ... [¶]

71.    IRS qualification (IRS Letter of Determination) assures security and tax advantages."

72.    As part of their common marketing plan, Defendants also e-mailed the Agents copies of legal opinions and IRS correspondence to induce the Agents into believing that their VEBA Programs complied with § 419A(f)(6). This included an IRS "Favorable Determination Letter" dated August 1, 1988, an October 2, 1998 IRS "no change" letter, and an extensive opinion letter from an attorney named Frederick A. Romero. But Defendants deliberately withheld the January 27, 2004 Reish letter, which concluded that Defendants' VEBA Programs did not contain certain provisions required under the new regulations under § 419A(f)(6) and, therefore, were not compliant. Thus, the Agents did not know that the claimed tax

advantages were illusory.

73.    AIG routinely explained their Programs to the Agents as follows:

a.    A small, closely held business joins one of their VEBA Programs and purchases specialized whole life insurance Policies for its owner(s) (and perhaps other employees as well).

b.    The VEBA Program is the policyholder of record for the Policy(ies) and holds it/them for the benefit of the owner(s).

c.    The business makes five annual, supposedly tax-deductible contributions to the Program, which uses those contributions to make premium payments to the Insurer.

d.    Initially, the Program is the named beneficiary under each Policy and would receive any benefits that might be paid, but the owner designates those to whom the Program would, in turn, pay the benefits.

e.    After five years, the Program: (i) allows the business to exit the Program if it encounters "adverse business conditions," a purposefully lenient contractual standard that any business can properly meet and that Plaintiffs did meet; (ii) transfers ownership of the Policy(ies) to the owner(s); and

f.    Issues a 1099 to each owner based on the surrender value of their Policy. To keep the tax liability low, the Policies were designed with low surrender values.

g.    Each owner holds their Policy in his or her name for another two years. Then, on the first day of the eighth year, the Insurer allows the owner to exchange his or her Policy for one with a higher cash value and a lower death benefit. The Insurer agrees in advance that the exchange can be made without

-28-

penalty (i.e., the surrender value would equal the amount of the premiums made).

   h. Each owner may then borrow against or even cash out of the new policy, supposedly on a tax-free basis. Because the new policy has a higher cash value (at the cost of a correspondingly lower death benefit), the amount available to the owner to withdraw is significantly higher than under the original Policy.

  74. Based on Defendants' negligent and false representations and their concealment of material information, the Agents believed that the Policies provided significant tax advantages when purchased through one of Defendants' Program. Specifically, based on Defendants' representations, the Agents believed that the contributions were tax-deductible to the businesses in the year made, and that the owners could withdraw significant benefits on a tax-free basis after the exchange on the first day of the eighth year.

  75. On July 10, 2006, Lalat e-mailed Sierk that he could obtain a "VEBA Plan Design / Proposal" from IPS by filing out an IPS form entitled "Welfare Benefit Census" and faxing it to 310-388-0508, the fax number listed for IPS. The next step, Lalat explained in this e-mail, was to fill out a "Client Confidential Information Form" and that the clients would then receive "customized VEBA plan documents within 3-4 business days." Notably, the end of the latter form was pre-filled out to indicate that Defendant Innovative was the agent. The e-mail explained that this form too should be faxed to 310-388-0508 when completed. Both of these forms were attached to the e-mail, as was a third form entitled "AIG / American General / Part A Life Insurance Application."

  76. Lalat's July 10, 2006 e-mail to Sierk and other Agents also attached

informational documents purporting to establish the legality of Defendants' VEBA Programs. One, from AIG itself and entitled "AIG Advisor Group Insurance Services Division Sales Insight," stated that the IRS had recently ruled that a company could properly deduct contributions to a VEBA program used to purchase life insurance policies. Lalat e-mailed this same document to Sierk again in November and December 2006.

77.    Defendants e-mailed a proposal to Sierk and other Agents. One proposal, dated July 31, 2006, stated among other things that: (a) Defendants' VEBA Programs had the "Support of Substantial Legal Authority"; (b) "the Amount You Contribute Will Be 100% Tax Deductible"; (c) those amounts will be "Deferred in a Safe, Creditor Proof, Tax Exempt Environment"; and (d) participation in the Program meant "Substantially Reducing Income and Estate Taxes." In reliance on Defendants' and their Agents' false or negligent statements, material misstatements, and material omissions, Plaintiffs agreed to join the SCMAPL Program and purchase Policies for Plaintiffs.

78.    On August 6, 2006, Elliott sent Sierk an e-mail (copied on Mordin and Lalat) in which Defendants quelled Sierk's stated concern that these were Listed Transactions such that his clients would have to report their participation to the IRS. This e-mail concluded with the following statement by Defendants: "We believe that the VEBA's sponsorship of the ten or more employer plan using this deduction established that we are not a tax shelter."

79.    On or about October 16, 2006, Defendants sent some Agents and Plaintiffs a set of Master Plan Documents to sign via U.S. Mail. The cover letter was signed by Elliott, noted that copies were sent to Laban and IPS, and included

this statement: "Enclosed you will find the completed signature pages which Laban Pattanaik asked us to prepare for your review." The enclosed documents underscored the fact that these documents were prepared by Defendants. One included the notation "© Sea Nine Associates." Another was printed on stationary bearing the name "Sea Nine Associates", included Sea Nine's logo, and was signed by Elliott. Some Plaintiffs signed where requested and thus joined the Program.

80.    Plaintiffs made contributions into the SCMAPL VEBA Program by mail and/or wire transfer(s), including, but not limited to:

a.    Asokan made five (5) contributions of $100,000.00 each to the SCMAPL Program under Policy No. A1E050082C with Sreenivasan Asokan as the Insured totaling approximately $500,000.00.   Asokan reserves the right to amend these figures as discovery is ongoing.

b.    Raghavan made five (5) contributions of $175,000.00 each to the SCMAPL Program under Policy No. A10222488C with Chakravarthy Raghavan as the Insured totaling approximately $875,000.00. Raghavan reserves the right to amend these figures as discovery is ongoing.

c.    Raghavan also made five (5) contributions of $25,000.00 each to the SCMAPL Program under Policy No. A1E050023C totaling approximately $125,000.00.  Raghavan reserves the right to amend these figures as discovery is ongoing.

d.    Pidikiti made five (5) contributions of $250,000.00 each to the SCMAPL Program under Policy No. A10222477C with Nanni Pidikiti as the Insured totaling approximately $1,250,000.00.  Pidikit reserves the right to amend these figures as discovery is ongoing.

e.     Parekh made five (5) contributions of $100,000.00 each to the SCMAPL Program under Policy No. A1E050071C with Rakesh Parekh as the Insured totaling approximately $500,000.00.  Parekh reserves the right to amend these figures as discovery is ongoing.

f.     R. Reddy made five (5) contributions of $161,091.00 each to the SCMAPL Program under Policy No. A10221980C with Ram Reddy as the Insured totaling approximately $805,455.50.  R. Reddy reserves the right to amend these figures as discovery is ongoing.

g.     M. Reddy made five (5) contributions of $ 38,909.00 each   to the SCMAPL Program under Policy No. A10207935C with Madhubala Reddy as the Insured totaling approximately $ 194,545.00.  M. Reddy reserves the right to amend these figures as discovery is ongoing.

h.     Lodge made multiple contributions of nearly $1,000,000.00 to the SCMAPL Program with Rodger Lodge as the Insured.  Lodge reserves the right to amend this figure as discovery is ongoing.

81.     Plaintiffs discovered the true nature of the VEBA Programs in late 2011 when the IRS assessed taxes, interest and penalties against the Plaintiffs for the years listed below in the following breakdown:

a.     Asokan was assessed a grand total of $1,254,274.14 in taxes, interest and penalties pursuant to 26 U.S.C. § 6706A (failure to report a Listed Transaction) for the years of 2008 through 2009;

b.     Raghaven was assessed a total of $451,450.22 in taxes, interest and penalties under 26 U.S.C. § 6707A for 2010;

c.     Pidikiti was assessed a total of $688,079.92 in taxes, interest

and penalties under 26 U.S.C. § 6707A for 2008 through 2009;

      d.    Parekh was assessed and settled with the IRS for a total of $160,000.00 in taxes, interest and penalties under 26 U.S.C. § 6707A for 2008 through 2009; and

      e.    Similarly, R. Reddy, M. Reddy, and Lodge were assessed millions of dollars in taxes, interest and penalties under 26 U.S.C. § 6707A for 2008 through 2009.

82.    Prior to these final assessments, Plaintiffs did not know and had no reason to know that Defendants had engaged in wrongdoing or that they had been injured by the conduct alleged in this Complaint.

83.    In addition to the IRS penalties listed above and the contributions into the VEBA Program, Plaintiffs have incurred legal and accounting fees, lost investment opportunities by putting their money in the VEBA Program, to which they now have no access, and have suffered from anxiety, emotional distress, among other damages to be proven at trial. Further, Plaintiffs are likely to face additional tax liabilities in the future that they would not have incurred but for Defendants' negligence and wrongdoing.

84.    The State of Florida has a statute specifically outlining which actions subject foreign insurers to jurisdiction in Florida State courts. Sections 626.904 through 626.912 are collectively referred to as the "Unauthorized Insurers Process Law." §626.904, Fla. Stat. (2005). Section 626.905 is entitled "Purpose of Unauthorized Insurers Process Law" and provides:

> The purpose of the Unauthorized Insurers Process Law is to subject certain insurers and persons representing or aiding such insurers to the jurisdiction of courts of this state in suits by or on behalf of insureds

or beneficiaries under insurance contracts. The Legislature declares that it is a subject of concern that many residents of this state hold policies of insurance issued or delivered in the state by insurers while not authorized to do business in this state, thus presenting to such residents the often insuperable obstacle of resorting to distant forums for the purpose of asserting legal rights under such policies. In furtherance of such state interest, the Legislature herein provides a method of substituted service of process upon unauthorized insurers and persons representing or aiding such insurers, and declares that in so doing it exercises its power to protect its residents and to define, for the purpose of this chapter, what constitutes doing business in this state . . . .

85. Section 626.906 specifies the acts which subject foreign insurers to jurisdiction in Florida courts:

(1) The issuance or delivery of contracts of insurance to residents of this state or to corporations authorized to do business therein;

(2) The solicitation of applications for such contracts;

(3) The collection of premiums, membership fees, assessments, or other considerations for such contracts; or

(4) Any other transaction of insurance.

86. The Legislature has defined the term "transact" as it relates to insurance to include any of the following:

(1) Solicitation or inducement.

(2) Preliminary negotiations.

(3) Effectuation of a contract of insurance.

(4) Transaction of matters subsequent to effectuation of a contract of insurance and arising out of it.

87. Defendants knew, or should have known, that none of their VEBA Programs, including the SCMAPL Program, complied with provisions of federal

-34-

tax law that supposedly provided the tax advantages that Defendants claimed. Defendants, and each of them, negligently and/or intentionally failed to disclose this information. Despite knowledge of the noncompliant nature of their Programs, Defendants continued to make representations that the VEBA Programs were compliant to Plaintiffs.

88.    Defendant AIG, which designed its Policies to be used in conjunction with these VEBA Programs and actively participated in the Agents' marketing efforts, knew or should have known that its agents were marketing and promoting these Programs as a tax-avoidance transaction. However, even after AIG received actual notice of the noncompliant nature of these Programs, AIG knowingly and willingly continued to participate in this fraudulent scheme and continued to derive profits at Plaintiffs' expense.

89.    Defendants engaged in the wrongful conduct alleged herein and utilized the Agents to induce Plaintiffs to join their VEBA Programs and buy the Policies, which Plaintiffs would not have done had they known the true facts. Defendants knew, or should have known, that Plaintiffs were ignorant of the true facts at all relevant times.

G.    Defendants Used A Common Marketing Plan And The Same Modus Operandi

90.    Defendants used a common marketing plan and the same basic modus operandi to promote their VEBA Programs and sell AIG Policies to persons who suffered similar damages. See, e.g., *United States of America v. Kenneth Elliott*, et al., U.S. District Court, C. D. Cal. Case No. 13-CV-01582-JLS-JPR, Dkt. No. 1 at ¶¶ 3-4, 16, 33-99 (alleging a common scheme); *J & M v. Callahan*, et al., U.S.

District Court, S.D. Ala. Case No. 07-CV-00883, Dkt. No. 1, at ¶¶ 8-16, 21-28 (alleging a similar sequence of events in 2004 to 2006 in a complaint filed against AIG, Lalat, IPS, and others); *Smith, et al. v. Elliott*, et al., Hawaii Circuit Court, First Circuit, Case No. 09-1-2282-10 KKS, First Amended Complaint filed 2/24/2011 at ¶¶ 24-69 (alleging a similar sequence of events against Innovative, IPS, Laban, Lalat, Sea Nine, Elliott).

H.    Florida Statutes Regarding Concealment and Misrepresentation in the Sale of Insurance Policies

91.    Defendants had a duty to communicate to the Agents and to Plaintiffs in good faith, all facts within their knowledge which were ... material to the contract. See Fla. Stat. § 626.9541 providing that false advertising of benefits of an insurance policy are prohibited. There is no possible way that Plaintiffs could have discovered the opinion letter from the Reish law firm and other facts because Defendants failed to disclose it.

92.    Pursuant to Florida Statute § 626.99275, Defendants' concealment of material information and false advertising regarding the Policies, as alleged elsewhere in this Complaint, constitutes unfair competition, grounds for damages and rescission whether the concealment was intentional or unintentional. Likewise, Plaintiffs are entitled to rescind the Policies based on Defendants' material misrepresentations and/or a simple mistake of fact at the time Plaintiffs gave their consent to the transactions with Defendants.

## FIRST CAUSE OF ACTION

### *Rescission Against All Defendants*

93.    Plaintiffs incorporate by reference the allegations contained in the

preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

94.    When marketing their VEBA Programs and Policies to Plaintiffs, AIG directly and through the Agents, intentionally, negligently and/or mistakenly misstated material facts. Among other things, Defendants misrepresented that contributions to the Programs would be tax deductible to Participating Employers in the year those contributions were made, and that by following the steps set forth elsewhere in this Complaint, Participating Employees would be able to draw benefits at a later date on a tax-free basis. When agreeing to join Defendants' VEBA Programs and purchase the Policies, Plaintiffs believed these things to be true. As alleged more particularly elsewhere in this Complaint, these representations were false.

95.    As further alleged elsewhere in this Complaint, Defendants intentionally, negligently, and/or mistakenly failed to disclose material information, including but not limited to the fact that Defendants' VEBA Programs are Listed Transactions. Nor did Defendants disclose the January 2004 opinion letter in which the Reish law firm advised Defendants that their VEBA Programs did not comply with § 419A(f)(6). Plaintiffs would not have joined Defendants' Programs or purchased the Policies had these facts been disclosed. Defendants knew, or should have known, that Plaintiffs were ignorant of the true facts relating to the transactions at issue.

96.    As a result of Defendants' intentional, negligent and/or mistaken misstatement of material facts and/or failure to disclose material facts, and/or Plaintiffs' material mistake of fact at the time they consented to the transactions with Defendants, Plaintiffs are entitled to rescind: (a) their agreement to join the

VEBA Programs; and (b) the Policies through the Programs.

97.    Service of this Complaint and related pleadings on Defendants constitutes notice of rescission of all agreements entered into between Plaintiffs on the one hand, and Defendants on the other, including the Adoption Agreements and the Policies.

98.    Plaintiffs are also entitled to recover the consequential damages they sustained as a direct and proximate result of Defendants' intentional misconduct and/or negligent conduct in an amount to be determined at trial in excess of the jurisdictional threshold of this Court.

## SECOND CAUSE OF ACTION
### RICO (Fla. Stat. §§ 895.01-895.06) and Civil Remedies for Criminal Practices Under Fla. Stat. §772.104 Against All Defendants

99.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

100.    In violation of Florida Statutes §§817.03, 817.19, 812.014, 817.41, 772.103, 626.9521 and 626.9541, Defendants, and each of them, by their words and/or actions, objectively manifested an agreement to participate, directly and/or indirectly, in a systematic, ongoing course of conduct and thereby conspired with, aided and abetted, encouraged and facilitated one another to commit the conduct alleged in this Complaint.

101.    Defendants, and each of them, by their Agents, their words and/or actions, objectively manifested an agreement on the common purpose of this enterprise, i.e., the sale of participation rights in their VEBA Programs, the sale of Policies through fraudulent means and/or a pattern of racketeering activity, and the reinvestment of the proceeds of that misconduct in their common enterprise.

102.    Further, Defendants, and each of them, by their words and/or actions, objectively manifested an agreement to perpetrate this scheme through predicate acts amounting to a pattern of racketeering activity. Defendants, and each of them, agreed to commit predicate crimes, aid and abet the commission of predicate crimes by other members of the enterprise, and/or that some members of the enterprise would commit the predicate acts for the benefit of all members and/or the enterprise.

103.    As more fully alleged elsewhere in this Complaint, Defendants have conducted this enterprise on an ongoing basis since 2001 or 2002, if not earlier. Through the conduct of this enterprise, Defendants have used the fraudulent means alleged herein to convince at least 205 entities and/or individuals to participate in their VEBA Programs and purchase Policies through those Programs. Defendants reinvested the proceeds of this scheme to defraud in the continuing enterprise.

104.    Each Defendant participated in the conduct of this enterprise in furtherance of a common purpose that all Defendants agreed upon – the sale of participation rights in Defendants' VEBA Programs and the sale of Policies through material misstatements and material omissions, and the reinvestment of the proceeds of that misconduct in the continuing enterprise.

105.    Through explicit and/or tacit agreements, Defendants agreed to function and did function as a unit and according to specified roles. Specifically, Defendant AIG agreed with the other Defendants to sell Policies through the Programs, provide marketing material for both the Programs and the Policies, and to help market the Programs and Policies through its employees. Among other things, Agents Innovative, Lalat, IPS, Laban and others agreed with the Defendants

to take a role in marketing and promoting the Programs and Policies. Elliott and Sea Nine agreed with the Defendants to assist in marketing the Programs and Policies and serve as the Administrator for the Programs.

106.   The conduct alleged in this Complaint was part of a scheme that Defendants formulated to defraud Plaintiffs. Defendants perpetrated this scheme with the specific intent to deceive and/or defraud Plaintiffs, and Defendants did deceive and/or defraud Plaintiffs.

107.   Defendants committed a continuous series of predicate acts of mail and wire fraud alleged in this Complaint in furtherance of this scheme. Among these predicate acts is the telephone call alleged above in which Mordin, a senior executive of Defendant AIG, inter alia, urged Sierk and the Agents to recommend that their clients sign up for Defendants' VEBA Programs and purchase Policies through those Programs. Plaintiffs are informed and believe and on that basis allege that Defendants made similar use of the U.S. Mail and interstate wires to perpetrate fraud against all 205 Participants identified in the DOJ complaint. In addition, Defendants stole embezzled and/or misappropriated the contributions that Plaintiffs made to the SCMAPL Program to cover premium payments, which conduct qualifies as another predicate act within the meaning of the Florida RICO statute. Fla. Stat. §§ 895.01-895.06, et seq.

108.   The predicate acts alleged in this Complaint constitute a pattern of racketeering activity within the meaning of Florida Statutes §§ 895.02(1)(a)(18) and 624.437(4)(c).  Defendants' conduct, including the predicate acts and pattern of racketeering activity, amount to and/or pose a threat of continued criminal conduct.

109.   As a direct and proximate result of Defendants' wrongful conduct, Defendants caused harm and/or injury to the individual Plaintiffs' business, and to the property of all Plaintiffs. Plaintiffs are entitled to recover treble damages, costs of suit and attorneys' fees.

## THIRD CAUSE OF ACTION
### *Common Law Unfair Competition Law Against All Defendants*

110.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

111.   Defendants' actions constitute an unfair, unlawful or deceptive business practice.

112.   Defendants' conduct was deceptive and fraudulent in that Defendants' common marketing plan, which misstated material facts and failed to disclose material facts, was deceptive and likely to deceive Plaintiffs who were uniformly misled about the true nature of Defendants' VEBA Programs, the Policies, and the tax consequences relating thereto.

113.   Had Plaintiffs and their Agents been aware of the material information that Defendants failed to disclose and the material misstatements of fact, they never would have agreed to join the SCMAPL VEBA Program or purchase policies through those Programs. Thus, as a result of Defendants' unlawful practices alleged above, Plaintiffs have suffered injury in fact and lost money or property.

114.   Defendants have derived substantial revenues from their wrongful and deceptive acts. Plaintiffs have been deprived of property to which they are entitled and/or in which they have a vested interest by means of Defendants' unlawful,

fraudulent and unfair business practices. Plaintiffs are entitled to an order requiring Defendants to restore to Plaintiffs all the money or property which Defendants may have acquired by means of such unfair competition.

115.   As a direct and proximate result of Defendants' wrongful conduct, Defendants caused harm and/or injury to the individual Plaintiffs' business, and to the property of all Plaintiffs. Plaintiffs are entitled to recover treble damages, costs of suit and attorneys' fees.

### FOURTH CAUSE OF ACTION
### *Florida's Misleading Advertising Law (Fla. Stat. §817.41 et seq.)*
### *Against All Defendants*

116.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

117.   Defendants, and each of them, intended to supply services in conjunction with their VEBA Programs and/or dispose of personal property.

118.   Defendants, and each of them, publicly disseminated advertising regarding their Programs and Policies that contained statements that were fraudulent, untrue and/or misleading. Defendants, and each of them, knew or in the exercise of reasonable care should have known, that this advertising falsely described their VEBA Programs, their Policies, and the tax consequences relating thereto and Plaintiffs would be induced to rely on an act upon such advertising.

119.   Defendants' statements constituted misleading advertising under Florida Statute § 817.40(5).

120.   Defendants have derived substantial revenues from their false advertising. Plaintiffs have been injured and deprived of property to which they are entitled and/or in which they have a vested interest by means of Defendants'

violations of Florida's Misleading Advertising Law. Plaintiffs are entitled to an order requiring Defendants to restore to Plaintiffs all the money or property which Defendants may have acquired by means of such false advertising, including attorneys' fees, costs, and punitive damages pursuant to Florida Statute § 817.41(6).

121.   As a direct and proximate result of Defendants' misconduct and deception, Plaintiffs have been damaged in a sum in excess of the jurisdictional threshold of this Court, and in additional amounts to be determined at time of trial, including interest and costs.

## FIFTH CAUSE OF ACTION

### *Fraud by Concealment, Against All Defendants*

122.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

123.   Defendants, and each of them, directly and through the Agents, failed to disclose material facts to Plaintiffs and the Agents, including that: (a) participants in prior versions of Defendants' VEBA Programs were audited by the IRS, had their deductions disallowed and were forced to pay penalties, back taxes and interest; (b) that Defendants' VEBA Programs were Listed Transactions that had to be disclosed to the IRS because they were the same or substantially similar to transactions determined to be unlawful tax avoidance schemes; and (c) Defendants own lawyers advised them in writing that the Programs did not comply with §419A(f)(6). Defendants concealed this material information with the intent to induce Plaintiffs to join their Programs, purchase Policies, and make substantial payments to Defendants.

-43-

124.   Defendants and each of them engaged in, adopted and/or ratified the misconduct alleged in this Complaint with the intent to deceive Plaintiffs and with the knowledge that Plaintiffs would be deceived. At all relevant times, Defendants expected that Plaintiffs would rely, and knew that Plaintiffs did rely, upon the material omissions alleged herein.

125.   Plaintiffs reasonably relied on Defendants' failure to disclose material facts in agreeing to participate in Defendants' Programs, in agreeing to purchase the Policies, and in making the payments to Defendants. Plaintiffs would not have entered into the Adoption Agreement, purchased the Policies, or made substantial payments to Defendants had they known the true facts.

126.   As a direct and proximate result of Defendants' misconduct and deception, Plaintiffs have been damaged in a sum in excess of the jurisdictional threshold of this Court, and in additional amounts to be determined at time of trial, including interest and costs.

## SIXTH CAUSE OF ACTION

### *Common Law Fraud Against All Defendants*

127.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

128.   Defendants, and each of them, directly and through the Agents, made various misrepresentations of material fact to Plaintiffs as alleged above, and did so with the intent to induce Plaintiffs to join the SCMAPL VEBA Program, purchase Policies, and make substantial payments to Defendants.

129.   Defendants and each of them engaged in, adopted and/or ratified the misconduct alleged in this Complaint with the intent to deceive Plaintiffs and with

the knowledge that Plaintiffs would be deceived. At all relevant times, Defendants expected that Plaintiffs would rely, and knew that Plaintiffs did rely, upon the material misrepresentations alleged herein.

130.   Plaintiffs reasonably relied on Defendants' misrepresentations of material facts in agreeing to participate in the SCMAPL Program, purchase the Policies, and make the payments to Defendants. Plaintiffs would not have entered into the Adoption Agreement, purchased the Policies, or made substantial payments to Defendants had they known the true facts.

131.   As a direct and proximate result of Defendants' misconduct and deception, Plaintiffs have been damaged in a sum in excess of the jurisdictional threshold of this Court, and in additional amounts to be determined at time of trial, including interest and costs.

## SEVENTH CAUSE OF ACTION

### *Aiding and Abetting Against Defendant AIG*

132.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

133.   At all relevant times, Defendant AIG knew that the conduct of the Agents, without full disclosure by AIG, constituted violations of RICO and/or a breach of legal duties owed to Plaintiffs.

134.   Defendant AIG utilized the Agents pursuant to a common design, gave substantial assistance or encouragement to the Agents' negligent, wrongful or unlawful conduct, and/or gave substantial assistance to the Agents in accomplishing a tortious result.

135.   Defendant AIG's own conduct, separately considered, constituted a

breach of duty to Plaintiffs.

136.   As a proximate and direct result of AIG's aiding and abetting the Agents, Plaintiffs were damaged as alleged above and in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### Violations of § 501 Part II Florida Statutes Deceptive and Unfair Acts or Practices

137.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

138.   The Defendants, in the course of trade and commerce, violated Part II of Chapter 501, Florida Statutes, relating to Florida Deceptive and Unfair Trade Practices Act ("FDUPTA").  Section 501.204 of that Act prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

139.   The Defendants violated FDUPTA by committing unconscionable and deceptive acts and practices.

140.   The Defendants knew or should have known that the above actions were in violation of the Florida Deceptive and Unfair Trade Practices Act, Part II.

141.   Defendants' acts and practices alleged herein have and continue to injure and prejudice the Plaintiffs.

142.   By reason of the foregoing, the Defendants violated §501, Florida Statutes.

143.   Plaintiffs are entitled to damages and attorneys' fees and costs from Defendants who are liable.

## NINTH CAUSE OF ACTION

### *Breach of Fiduciary Duty against Defendants*

144.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

145.   This is an action for breach of fiduciary duty against Defendants, for damages in excess of $15,000.00, exclusive of interest, attorneys' fees and costs.

146.   Defendants' Agents and employees developed a personal, fiduciary and confidential relationship with the individual Plaintiffs.

147.   Defendants' Agents and employees personally advised and represented to Plaintiffs individually that Plaintiffs should invest in the VEBA plan. Plaintiffs reposed trust in Defendants.

148.   Defendants represented that they would provide Plaintiffs the highest level of fiduciary duty arising from their role as investment advisors and from their close and confidential business relationship.

149.   Defendants represented to Plaintiffs that Defendants would continue to provide personal advice and information regarding their investment.

150.   Defendants and their Agents and employees held positions of confidentiality and mutual trust with Plaintiffs and voluntarily undertook and owed Plaintiffs a fiduciary duty to act in good faith for, on behalf of, and, in the best interests of Plaintiffs individually.

151.   Defendants and their Agents and employees held a position of confidentiality and mutual trust with the Plaintiffs, and owed Plaintiffs a fiduciary duty to act in good faith for, on behalf of, and in the best interests of Plaintiffs.

152.   Plaintiffs reasonably and justifiably relied upon Defendants' and their

Agents' fiduciary position, business experience, representations and promises in agreeing to invest in stock.

153.   Defendants violated their fiduciary duties to Plaintiffs individually and separate from their shareholders by engaging in multiple acts and/or omissions including, but not limited to, the following:

a.     Personally inducing Plaintiffs to invest more money while misrepresenting the tax statutes of VEBA; and

b.     Inducing Plaintiffs to invest while concealing the tax statutes of VEBA.

154.   Defendants also breached their fiduciary duties to the Plaintiffs by concealing from and failing to disclose the acts and omissions described above and their other negligent and/or fraudulent actions, conflicts of interest, and self-dealing.

155.   Plaintiffs have suffered damages as a result of Defendants' breaches of their fiduciary duties owed to Plaintiffs.

## TENTH CAUSE OF ACTION

### *Constructive Fraud against Defendants*

156.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

157.   This is an action against Defendants for constructive fraud and for damages in excess of $15,000.00, exclusive of interest, attorneys' fees and costs.

158.   Defendants and their Agents and employees occupied a confidential and fiduciary relationship with the Plaintiffs:

a.  due to their acting as investment advisors to Plaintiffs; and

b. due to the development of a trusting relationship as Plaintiffs reposed trust in Defendants who accepted said trust.

159.  Defendants have engaged in fraud, self-dealing and concealment of their conflicts of interest to the detriment and at the expense of the Plaintiffs.

160.  In addition, Defendants occupied a fiduciary and confidential relationship with the Plaintiffs by way of his participation with the Plaintiffs in a confidential business plan and their personal inducement of Plaintiffs to invest in VEBA.

161.  As a result of the above-described fiduciary and confidential relationships, Defendants owed the Plaintiffs a fiduciary duty and a duty of fair dealing with regard to all the business affairs involving VEBA.

162.  Defendants received a direct benefit from their fiduciary and confidential relationship with Plaintiffs, namely their money.

163.  As a result of the fraud, self-dealing, conspiracy and concealment of the conflicts of interest by Defendants, Plaintiffs have been denied the benefit of their investment.

164.  Defendants owed Plaintiffs individually a direct and continuing, fiduciary duty to deal in good faith for and on behalf of and in the best interests of the Plaintiffs.

165.  Defendants have received the benefits as a result of the fraud perpetrated upon the Plaintiffs through the present.

166.  Plaintiffs have suffered damages as a result of the breach of fiduciary duties to and the violation of confidential relationships with Defendants by Defendants and by their diversion of Plaintiffs' investments.

## ELEVENTH CAUSE OF ACTION

### *Negligent Misrepresentation*

167.  Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

168.  Defendants, their Agents, and employees made misrepresentations of material fact that they may have believed to be true.

169.  Defendants were negligent in making the misrepresentations as they should have known they were false.

170. Defendants intended to induce Plaintiffs to rely on the misrepresentations.

171.  Plaintiffs justifiably relied on the Defendants' misrepresentations and were injured.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, as follows:

(1)    For special damages according to proof;

(2)    For general damages according to proof;

(3)    For attorneys' fees and costs according to proof;

(4)    For restitution of all monies paid to the Defendants according to proof;

(5)    For pre-judgment and post-judgment interest;

(6)    For a constructive trust be imposed on the assets, property, contracts, revenues, income and profits of Defendants to the extent of Plaintiffs' investments in the same;

(7)    For damages sustained as investors in VEBA; and

(8)    For damages, interest, prejudgment interest, attorneys' fees and costs,

and for such other and further relief that this Court deems appropriate.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

DATED:    August 14, 2015                MORGAN & MORGAN, P.A.

By: */s/ Clay M. Townsend*
Clay M. Townsend, Esquire
Florida Bar No.: 363375
Keith R. Mitnik, Esquire
Florida Bar No.: 436127
20 North Orange Avenue, 15th Floor
Orlando, Florida 32801
Phone: (407) 418-2075
Fax: (407) 245-3346
Email: ctownsend@forthepeople.com
kmitnik@forthepeople.com
*Attorneys for Plaintiffs*