UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SREENIVASAN ASOKAN, ANURADHA
ASOKAN, INDEPENDENT ANESTHESIA
SERVICES, P.A., CHAKRAVARTHY RAGHAVAN,
C. RAGHAVAN, M.D., P.A.,  NANNI PIDIKITI,
NANNI PIDIKITI, M.D., P.C,., RAKESH PAREKH,
TEJAL PAREKH, RAKESH S. PAREKH, M.D.,
P.A., RAM REDDY, MADHUBALA REDDY,
FAMILY INTERNAL MEDICINE, P.A., ROGER
LODGE, PAMELA PAULSHOCK, and THREE
POINT PRODUCTIONS, INC.

                           Plaintiffs,                    Case No: 6:15-cv-02048-PGB-KRS

          vs.

AMERICAN GENERAL LIFE INSURANCE
COMPANY, a Texas company and subsidiary of
American International Group, Inc. ("AIG")

                           Defendant.

_____

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiffs, SREENIVASAN ASOKAN, ANURADHA ASOKAN, INDEPENDENT

ANESTHESIA SERVICES, P.A., CHAKRAVARTHY RAGHAVAN, C. RAGHAVAN, M.D.,

P.A., NANNI PIDIKITI, NANNI PIDIKITI, M.D., P.C., RAKESH PAREKH, TEJAL

PAREKH, RAKESH S. PAREKH, M.D., P.A., RAM REDDY, MADHUBALA REDDY,

FAMILY INTERNAL MEDICINE, P.A., ROGER LODGE, PAMELA PAULSHOCK, and

THREE POINT PRODUCTIONS, INC. (collectively referred to as "Plaintiffs"), sue Defendant

AMERICAN GENERAL LIFE INSURANCE COMPANY, a Texas company ("AIG" or

"Defendant").  Plaintiffs believe that evidentiary support exists for the allegations set forth below

upon a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.      On August 14, 2015, this action was initially filed in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, styled Case No. 2015-CA-007602-O; *Sreenivasan Asokan, et al. v. American General Life Insurance Company* (the "State Court Action").

2.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this is a civil action involving an amount in controversy exceeding $75,000.00 between parties of diverse citizenship.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1441 and 1446 because Plaintiffs filed the State Court Action in this judicial district and division.

## INTRODUCTION

4.      Defendant has organized, promoted, administered, and sold rights to participate in Voluntary Employee Beneficiary Association Plans that purported to offer the owners of small, closely-held businesses an insurance-oriented welfare benefit with tax advantages. (As used herein, the terms "VEBA plan(s)" or "plan(s)" refer to voluntary employee beneficiary associations generally and the terms "VEBA Program(s)" or "Program(s)" refer to the plans established, promoted and administered by Defendant.) An integral part of these VEBA Programs are specialized whole life insurance policies that, when purchased and initially owned through a VEBA Program and then later exchanged for another policy, supposedly allowed these small business owners to make tax-deductible premium payments and, at later dates, withdraw funds on a tax-free basis ("Policies" or "Policy").

5.      The Internal Revenue Service ("IRS") has ruled that VEBA plans like the ones Defendant established, promoted and administered do not comply with federal tax law,

determinations that have been consistently upheld by federal courts. At all relevant times, Defendant was well aware of the noncompliant nature of its Programs. Litigation involving prior versions of the VEBA Programs at issue here and determinations by the IRS put Defendant on notice that its Programs are an unlawful tax avoidance scheme. Nonetheless, Defendant continued to promote, administer, and sell participation rights in its VEBA Programs, and further continued to market and sell the accompanying Policies. In January 2004, tax attorneys retained by Defendant issued an opinion letter advising them that its VEBA Programs did not did not comply with Internal Revenue Code ("I.R.C.") § 419A(f)(6), the relevant provision of the Tax Code that supposedly permitted the tax-deductible contributions and the tax-free withdrawals ("§ 419A(f)(6)"). In 2013, the U.S. Department of Justice ("DOJ") filed a civil action in the Central District of California (Case 8:13-cv-01582-JLS-JPR) to enjoin Defendant's agents from continuing to market and sell these Programs.

6.      Plaintiffs later discovered that Defendant failed to disclose:

a.      The IRS has deemed VEBA plans like Defendant's Programs to be suspect "Listed Transactions," or in other words, transactions that are the same or substantially similar to ones that the IRS has determined to be illegal tax avoidance schemes. The IRS imposes significant penalties on those who participate in Listed Transactions without disclosing that fact to the IRS.

b.      Contrary to Defendant's representations, the "contributions" that Participants make to the Programs were simply life insurance premium payments routed through the Program, were not tax-deductible as represented.

c.      Defendant's claims that Participants could withdraw funds on a tax-free basis are false. The IRS considers the features of these Programs that supposedly allowed

Participants to withdraw funds on a tax-free basis to be a deferred compensation scheme subject to taxation.

      d.     With their high fees and low cash values, the Policies have few advantages once stripped of their supposed tax advantages.

7.     In 2006 – more than two years after tax attorneys advised Defendant that these Programs did not comply with federal tax law – Defendant reached out to its agents and financial planners to convince them to have their VEBA clients participate in its VEBA Programs. Defendant, including a senior AIG executive, told the financial adviser that, if his clients joined one of Defendant's VEBA Programs and purchased the related Policies, their premium payments would be tax deductible and they would be allowed to withdraw funds on a tax-free basis at a later date. When Plaintiffs' financial planners raised questions about earlier IRS actions against such plans and inquired whether they were Listed Transactions, Defendant assured him that its

8.     VEBA Programs had been vetted by counsel and complied with § 419A(f)(6) and all other provisions of law. Defendant also provided him with opinion letters from tax attorneys and an IRS determination letter to that effect. But Defendant concealed the January 2004 opinion letter that concluded its VEBA Programs did not comply with § 419A(f)(6).

9.     Plaintiffs' financial adviser(s) relayed Defendant's false claims about its VEBA Programs to Plaintiffs. Since they had no knowledge of the January 2004 improperly withheld opinion letter, Plaintiffs' financial planner was unable to warn Plaintiffs that the supposed tax advantages were illusory, or that participation in one of Defendant's Programs would likely result in an IRS audit and the imposition of penalties. In this fashion, Defendant persuaded Plaintiffs to join one of its Programs and purchase Policies from Defendant.

10.    In late 2011 and early 2012, after Plaintiffs paid significant monetary contributions to the Program they joined, which were to be used to pay the premiums on the Policies, the IRS audited Plaintiffs and ultimately issued assessments for penalties, interest, and back taxes.

11.    Using similar methods and a common marketing plan, Defendant and its employees convinced dozens of other entities and individuals to join its Programs and purchase AIG Policies as documented in the DOJ complaint and other cases filed against Defendant herein. The various Programs were essentially identical, although established in the names of different associations.

12.    Defendant knew, or should have known, that its Programs did not comply with § 419A(f)(6) and related regulations, that the IRS would audit and impose penalties on the Plaintiffs for deducting the premium payments they paid for the Policies, and that the Plaintiffs would not be able to withdraw benefits on a tax-free basis.

13.    Defendant has violated Florida's Racketeer Influenced and Corrupt Organization Act, Fla. Stat. § 627.401, *et seq.* ("RICO"), as well as Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* (collectively, "FDUTPA"), and Florida's Misleading Advertising law, Fla. Stat. § 817.41 *et seq*  They also committed unfair competition, fraud by concealment, common law fraud, breach of fiduciary duties, constructive fraud, and negligent misrepresentation.

14.    Defendant worked closely with its agents on these Programs since 2001 or 2002, supplied some of the most critical marketing materials used to market these Programs, and sold many Policies. At all relevant times, Defendant knew that Plaintiffs were induced by

Defendant's conduct to believe that purchasing these Policies through a VEBA Program provided the significant tax advantages described elsewhere in this Complaint.

15.     Defendant is responsible for the wrongful or negligent conduct of its employees, its designated agents, and those who are its agents by operation of law.  Further, Defendant is responsible for the materially false and incomplete information that financial advisers obtained from Defendant and innocently relayed to Plaintiffs.

## **PLAINTIFFS**

16.     Plaintiff, Independent Anesthesia Services, P.A. ("IAS"), is a Florida corporation with a principal place of business in Orange County, Florida.

17.     Plaintiffs, Sreenivasan Asokan, M.D. ("Dr. Asokan") and Anuradha Asokan (Ms. Asokan"), are individuals and residents of Orange County, Florida.  Dr. Asokan is a shareholder and President of IAS, and Ms. Asokan is the Vice President of IAS.

18.     At Defendant's urging, Dr. Asokan joined a VEBA Program established in the name of IAS, and thus became a "Participating Employer" in that Program pursuant to an Adoption Agreement described below, and Dr. Asokan became a "Participating Employee" in the VEBA Master Plan and Master Trust under the Southern California Medical Profession Association ("SCMPA") pursuant to the Adoption Agreement.  Dr. Asokan is the named Insured of the Policy No. A1E050082C issued by Defendant.

19.     Plaintiff, C. Raghavan, M.D., P.A. ("CRPA"), is a Florida corporation with its principal place of business in Orange County, Florida.

20.     Plaintiff, Chakravarthy Raghavan, M.D. ("Dr. Raghavan"), is an individual resident of Orange County, Florida, and a shareholder and principal of CRPA.

21.     At  Defendant's urging, Dr. Raghavan joined a VEBA Program established in the name of CRPA, and thus became a "Participating Employer" in that Program pursuant to an Adoption Agreement described below, and Dr. Raghavan became a "Participating Employee" in the VEBA Master Plan and Master Trust under the SCMPA pursuant to the Adoption Agreement. Dr. Raghavan is the named Insured of the Policy Nos. A1E050023C and A10221980C issued by Defendant AIG.

22.     Plaintiff, Nanni Pidikiti, M.D., P.C. ("NPPC"), is a Mississippi corporation with its principal place of business in Alcorn County, Mississippi.

23.     Plaintiff, Nanni Pidikiti ("Dr. Pidikiti"), is an individual resident of Alcorn County, Mississippi, and a shareholder and principal of NPPC.

24.     At Defendant's urging, Dr. Pidikiti joined a VEBA Program established in the name of NPPC, and thus became a "Participating Employer" in that Program pursuant to an Adoption Agreement described below, and Dr. Pidikiti became a "Participating Employee" in the VEBA Master Plan and Master Trust under the SCMPA pursuant to the Adoption Agreement. Dr. Pidikiti is the named Insured of the Policy No. A10222477C issued by Defendant.

25.     Plaintiff, Rakesh S. Parekh, M.D., P.A. ("RPPA"), is a Florida corporation with its principal place of business in Seminole County, Florida.

26.     Plaintiffs, Rakesh S. Parekh ("Dr. Parekh") and Tejal Parekh ("Ms. Parekh"), are individual residents of Seminole County, Florida.  Dr. Parekh is a shareholder and principal of RPPA and the spouse of Ms. Parekh.

27.     At Defendant's urging, Dr. Parekh joined a VEBA Program established in the name of RPPA, and thus became a "Participating Employer" in that Program pursuant to an Adoption Agreement described below, and Parekh became a "Participating Employee" in the

VEBA Master Plan and Master Trust under the SCMPA pursuant to the Adoption Agreement. Dr. Parekh is the named Insured of the Policy No. A1E050071C issued by Defendant.

28.     Plaintiff, Family Internal Medicine, P.A. ("FIM"), is a Florida corporation with its principal place of business in Orange County, Florida.

29.     Plaintiffs, Ram Reddy, M.D. ("Dr. Reddy") and his wife Madhubala Reddy ("Ms. Reddy"), are individual residents of Orange County, Florida.  Dr. Reddy is the President and shareholder of FIM, and Ms. Reddy is an employee of FIM.

30.     At Defendant's urging, Dr. and Ms. Reddy joined a VEBA Program established in the name of FIM, and thus became a "Participating Employer" in that Program pursuant to an Adoption Agreement described below, and Dr. and Ms. Reddy became "Participating Employees" in the VEBA Master Plan and Master Trust under the SCMPA pursuant to the Adoption Agreement.  Dr. Reddy is the named Insured of the Policy No. A10221980C issued by Defendant and Ms. Reddy is the named Insured of the Policy No. A10207835C.

31.     Plaintiff, Three Point Productions, Inc. ("TPP"), is a California Corporation with its principal place of business in Los Angeles County, California.

32.     Plaintiffs, Rodger Lodge ("Mr. Lodge") and Pamela Paulshock ("Ms. Paulshock") are individual residents of Los Angeles County, California.  Mr. Lodge is the President of TPP, and the spouse of Ms. Paulshock.

33.     At Defendant's urging, Mr. Lodge joined a VEBA Program established in the name of TPP, and thus became a "Participating Employer" in that Program pursuant to an Adoption Agreement described below, and Mr. Lodge became a "Participating Employee" in the VEBA Program pursuant to the Adoption Agreement.  Mr. Lodge is the named Insured of the Policy No. A10207866C issued by Defendant.

## NON-PARTY ENTITIES AND INDIVIDUALS

34.     The SCMPA is the "sponsor" of a VEBA Program that Defendant established and administered, and SCMPA acted as an agent, representative or employee of Defendant.

35.     From 2007 to the present, Comerica Bank has served as the Trustee of a trust established to hold the assets of Defendant's Programs and served as the Programs' "funding mechanism." On information and belief, all of Comerica's activities were directed by Defendant; Comerica did not act in the absence of instructions from Defendant, and acted as an agent, representative or employee of Defendant.

36.     R. Wesley Sierk, III ACI, ARM, ChFC, a principal at Pine Avenue Partners, LLC ("Sierk"), provided information and marketing material to Plaintiffs' agents and financial planners and was Plaintiffs' financial planner. As alleged more fully elsewhere, Defendant communicated false and misleadingly incomplete information to Sierk who innocently relayed that false and misleadingly incomplete information to Plaintiffs, and acted as an agent, representative or employee of Defendant.

37.     At all relevant times, Royce Imhoff ("Imhoff") held senior executive positions at Defendant AIG, including President of Independent Distribution, and provided information and marketing material to Plaintiffs' agents and financial planners.  Imhoff acted as an agent, representative or employee of Defendant.

38.     At all relevant times, David Robinson ("Robinson") held senior executive positions at Defendant AIG, including senior counsel to AIG and later head of advance sales in the Affluent and Corporate Markets Group, and provided information and marketing material to Plaintiffs' agents and financial planners.  Robinson acted as an agent, representative or employee of Defendant.

39.     On information and belief, Peter Mordin ("Mordin") is an individual residing in Orange County, California who, at all relevant times, held senior positions with Defendant AIG, including National Marketing Director and Regional Vice President, and provided information and marketing material to Plaintiffs' agents and financial planners.  Mordin acted as an agent, representative or employee of Defendant.

40.     Imhoff, Robinson, and Mordin are collectively referred to as the "Employees" who provided information and marketing material to Plaintiffs' agents and financial planners.

41.     Sea Nine Associates, Inc. ("Sea Nine") is a Nevada corporation whose status with the California Secretary of State is now listed as "FTB Suspended."  At all relevant times, Sea Nine served as the Administrator or de facto Administrator for the Programs and was responsible for operating them and directing their activities, and provided information and marketing material to Plaintiffs' agents and financial planners.  Sea Nine Associates, Inc. acted as an agent, representative or employee of Defendant.

42.     Kenneth Elliott, individually and d.b.a. KAE, KAE Consulting and Vista Barranca ("Elliot"), is an individual residing in Orange County, California. Plaintiffs are informed and believe that, at all relevant times, Elliott was an employee of Sea Nine and an agent for Defendant, and provided information and marketing material to Plaintiffs' agents and financial planners.  Elliot acted as an agent, representative or employee of Defendant.

43.     Lalat Pattanaik ("Lalat") and Laban Pattanaik ("Laban") are brothers residing, on information and belief, in the State of California, County of Los Angeles, and provided information and marketing material to Plaintiffs' agents and financial planners.  Lalat and Laban acted as agents, representatives or employees of the Defendant.

44.     Innovative Private Strategies & Insurance Services, Inc. ("Innovative") is a California corporation whose status with the California Secretary of State is now listed as "FTB Suspended." At all relevant times, Laban was the sole owner, shareholder, director and/or principal of Innovative and was solely responsible for directing all of Innovative's affairs and provided information and marketing material to Plaintiffs' agents and financial planners. Innovative acted as an agent, representative or employee of Defendant.

45.     I.P.S. Private Advisors LLC ("IPS") is a California limited liability company with its principal place of business in Laguna Hills, California and, on information and belief, is equally owned and controlled by Lalat and his brother, Laban. Innovative and Laban retained IPS to market Defendant's VEBA Programs, and provided information and marketing material to Plaintiffs' agents and financial planners.  IPS acted as an agent, representative or employee of Defendant.

46.     Steve Ruff ("Ruff") was a financial planner for Plaintiffs at all times material hereto, is a resident of Orange County, Florida, and provided information and marketing material from the Defendant to the Plaintiffs.  Ruff assisted Plaintiffs in completing applications and acted as an agent, representative or employee of Defendant.

47.     Sea Nine, Elliott, Innovative, Laban, IPS, Lalat, and Ruff are collectively referred to herein as the "Agents" having been provided information and marketing materials from the Defendant and furnishing the same to the Plaintiffs, Plaintiffs' agents, and/or financial planners, thus acting as agents, representatives or employees of the Defendant. The Agents had actual and apparent authority from Defendant and the Plaintiffs believed they were dealing with AIG or person authorized to act for AIG.

## **DEFENDANT**

48.     Defendant American General Life Insurance Company is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Houston, Texas and is one of several marketing names for the insurance companies and affiliates comprising the domestic life operations of American International Group, Inc. ("AIG") which issues life insurance policies and annuities in Florida to Plaintiffs.  AIG is a foreign for-profit corporation registered to do business in Florida. As more fully alleged elsewhere in this Complaint, AIG specifically designed the Policies to be sold in conjunction with the VEBA Programs that Defendant developed and promoted (including the SCMPA Program) and took a leading role in marketing and selling not only the Policies, but also participation in the noncompliant VEBA Programs.   AIG also used American General Financial Group as a marketing name for AIG, as well as AIG.com and AIG Life and Retirement.

## **VICARIOUS LIABILITY ALLEGATIONS**

49.     At various times prior to the marketing and sale of the Policies to Plaintiffs, AIG filed "Notices of Agency Appointment" with the California Department of Insurance designating Innovative, Laban, and Elliott as agents of AIG. *See* Cal. Ins. Code § 1704. These Agents thereby became "life licensees" authorized to sell Policies on behalf of AIG. Cal. Ins. Code §§ 32(a); 1622(a). Further, Innovative and Laban became Master General Agents (a.k.a. "Level 7 Master General Agents") of AIG pursuant to a contract dated February 17, 2004.

50.     The Agents jointly presented a proposal for the Policies to Plaintiffs on behalf of Defendant, jointly transmitted applications for those Policies to AIG, and/or received commission payments from AIG. Because Defendant knew that its Policies were purchased in conjunction with VEBA Programs, participated in a unified marketing scheme that promoted

both its Policies and the Programs, and understood all of the details relating to those Programs, all of the conduct of the Agents alleged in this Complaint was within the course and scope of their agency relationship with Defendant.

51.     Defendant is also responsible for the wrongful acts and omissions of its Agents and Employees under the doctrine of respondeat superior.

## GENERAL ALLEGATIONS

**A.      The Common Characteristics and Tax Advantages of §419A(f)(6) Plans**

52.     A VEBA plan that complies with § 419A(f)(6) involves the creation of a joint trust or other fund that ten or more companies join. Those companies make tax-deductible contributions to this common trust or fund which, in turn, uses those contributions to purchase insurance contracts and other assets which provide welfare benefits – usually and in this case only life insurance – to certain of the participating companies' employees. A trustee (often a bank or other financial institution) typically takes formal ownership of the insurance policies purchased by the plan and conducts the day-to-day operations.

53.     Ordinarily, if a company purchases a standard term life insurance policy for an employee, the premium payments would be included as part of the employee's gross income, and therefore taxable (to the employee). See 26 C.F.R. § 1.61-2(d)(ii)(A). But if the company joins a properly established multiple-employer welfare benefit plan under § 419A(f)(6), its contributions to the plan are deductible (to the company), and the plan may use those contributions to purchase the same life insurance policy. In other words, premiums paid in the first case are not tax deductible while contributions (used to buy the exact same policy) in the second case are tax deductible. This makes a § 419A(f)(6)-compliant plan attractive.

B.      **Defendant's VEBA Programs**

54.     Defendant's VEBA Programs consist of a series of "Master Plan Documents" drafted by Defendant and a trust established by Defendant to hold the assets of the Program and serve as the "funding mechanism." The Master Plan Documents include the following: (a) "Master Plan" and "Master Trust" documents to establish the entity of ten or more employers required for a § 419A(f)(6) plan; (b) "Adoption Agreements" that the small businesses targeted by Defendant would sign to join the Program; and (c) "Summary Plan Descriptions" that such Participating Employers could issue to their eligible employees.

55.     The following summary is helpful to understand Defendant's VEBA Programs and the facts alleged herein:

a.      First, there is the "Sponsor," an association of employers in whose name the VEBA Program is established. SCMPA was one such association. Each VEBA Program was organized, promoted, administered, and operated by Defendant, without any material involvement by the Sponsor.

b.      Second, the small businesses persuaded to adopt one of Defendant's VEBA Program are known as the "Participating Employers" and their eligible employees who elected to participate – usually the owners of a closely held business – are referred to as "Participating Employees" (collectively, "Participants"). The Plaintiffs' small business medical practices are the Participating Employers and the individual Plaintiffs are the Participating Employees.

c.      Third, there is the "Insurer" who issues the Policies. In this case, the Insurer is Defendant, which marketed and sold Policies to Plaintiffs.

d.      Fourth, there are the "Insureds." In practice, these are the individuals defined above as Participating Employees – the owners of the small businesses that joined Defendant's VEBA Programs. Plaintiffs Dr. Asokan, Dr. Raghavan, Dr. Pidikiti, Dr. Parekh, Dr. Reddy, Ms. Reddy, and Mr. Lodge are Insureds.

e.      Fifth, each VEBA Program has a designated or de facto "Administrator" responsible for directing the affairs of the Program. Sea Nine and Elliott served as the Administrator for all Programs.

f.      Finally, there is the "Trustee" responsible for holding the assets entrusted to the Program and processing the required financial transactions as directed by Defendant (e.g., receiving "contributions" or in other words premium payments from Plaintiffs, and the payment of those premiums to the Insurer, etc.). In 2007, Sea Nine and/or Elliott retained Comerica to serve as Trustee for its Programs.

56.      The Master Plan Documents provided that a "Master Committee" would determine the kind of insurance policies to be purchased with the contributions, and be responsible for all related issues, such as the payment of benefits under the plan. In reality, the designated or de facto Administrator (Sea Nine and Elliott) made all relevant decisions and directed all of the Trustee's actions.

57.      The Master Plan Documents specified: (a) the eligibility requirements for Participants; (b) when and how Participating Employers were to make their contributions; (c) the nature of the insurance benefit to be provided by the Program, which was always life insurance; and (d) the conditions under which Participating Employers could terminate participation and thereby provide the Participating Employees the opportunity to take personal ownership of the life insurance policies.

58.     According to the DOJ complaint, these Master Plan Documents are "largely identical." In 2009, Defendant prepared a new set of Master Plan Documents that purportedly brought Defendant's VEBA Programs into compliance with § 419A(f)(6) but (a) according to the DOJ, the 2009 versions do not remedy the deficiencies, and (b) in any event, they were never implemented because none of the victims, Plaintiffs included, adopted them. In short, none of the Master Plan Documents complied with § 419A(f)(6) and related regulations, and so Participating Employers were not entitled to deduct their contributions as represented. To the contrary, these were Listed Transactions that Participants were required to disclose to the IRS or pay a penalty.

**C.      Defendant's Involvement In The Scheme**

59.     Defendant sold many Policies in conjunction with these VEBA Programs and had been working closely with the Agents since 2001 or 2002. On an ongoing basis, the Agents had extensive discussions with high-level executives at AIG, including Imhoff (AIG's President of the Independent Distribution), Robinson (who held various senior executive positions, including senior counsel to AIG and later head of advance sales in the Affluent and Corporate Markets Group), and Mordin.

60.     Lalat and Laban and their staff at IPS met regularly with Mordin. In or around August 2002 or 2003, Mordin introduced Robinson to Lalat and IPS. Thereafter, Robinson was in regular communication with the Agents about the VEBA Programs. Defendant was aware that Elliott was involved in the administration of the VEBA Programs and directly communicated with him regarding the Programs.

61.     Defendant, Robinson, and Mordin were not only aware of and never objected to the Agents' marketing strategy for the VEBA Programs, but also they allowed the Agents to use AIG-generated marketing materials and software in this marketing. Defendant provided an

advisors guide, which included a section on VEBA plans. Defendant also provided the Agents with numerous other marketing publications for VEBA plans.

62.     Defendant provided marketing material to the Agents with the knowledge and intent that the Agents would transmit that material to Plaintiffs and others using the U.S. Mail and/or e-mail transmitted across interstate wires. Defendant knew or should have known that this marketing would be used in conjunction with the fraudulent marketing of Defendant's VEBA Programs and the sale of Policies through those Programs.   Defendant knew or should have known that this marketing material was materially false and/or misleading when so used.

**D.     Defendant's VEBA Programs Violate Restrictions On § 419A(f)(6) Plans**

63.     There is a long history of companies misusing VEBA plans as tax avoidance schemes. There are rules to prevent such abuse. For example, if a participating corporation claims a deduction for contributions actually used to distribute corporate earnings to the corporation's shareholders, the deduction will be disallowed because such contributions are not an "ordinary and necessary" business expense within the meaning of I.R.C. § 162. Second, a company cannot deduct a contribution to a welfare benefit plan in the year made if the benefits provided constitute deferred compensation as defined in IRC § 404. See I.R.C. § 419(e)(2). Rather, the deduction must be deferred until the employee includes the compensation in his or her gross income. I.R.C. § 404(a)(5).

64.     Defendant and its Agents represented that the VEBA Programs, including the SCMPA Program, strictly complied with § 419A(f)(6) and all related rules and regulations. In fact, these Programs were noncompliant, as Defendant knew. The contributions Participating Employers made to the Programs for purchase of the Policies far exceeded the actual cost of the primary "welfare benefit" claimed to be the aim of the VEBA Program – the death benefit

derived from a life insurance policy; the same death benefit could be purchased for much less money. The amounts above the true cost of the death benefit were used to obtain the cash value portion of the Policies and, in effect, set aside those excess payments for the benefit of the owners of the companies.

65.     In other words, Defendant's VEBA Programs allowed the excess contributions to be used to pay premiums that mostly flowed through the accumulated cash values of these Policies, and then into the hands of the company owners. Thus, Defendant's VEBA Programs did not really provide a welfare benefit for Participants, but instead were mechanisms for distributing excess profits to owners and/or providing deferred compensation in a manner that avoided federal taxes.

66.     In 2013, the DOJ filed a civil action in U.S. District Court for the Central District of California (Case No. 13-CV-01582-JLS-JPR) against Sea Nine and Elliott to enjoin them from continuing to market and sell participation rights in Defendant's VEBA Programs because they do not comply with § 419(f)(6). As summarized in the DOJ complaint: "[T]he core purpose and effect of the participation in a Sea Nine VEBA plan is to provide participants with a mechanism to accumulate wealth for their personal benefit, unlawfully protecting that income from federal taxation by treating it as a welfare benefit plan when it was that in name only."  Elliot entered into a stipulated order with the U.S. Attorneys' Office on September 3, 2014 in U.S. District Court for the Central District of California enjoining Elliot from directly or indirectly promoting, administering, managing, marketing, or selling any version of the VEBA plans operated or administered by Sea Nine or similar to the VEBA plans operated or administered by Sea Nine.

67.     The IRS has audited numerous taxpayers who participated in one of Defendant's Programs and determined the taxpayer was liable back taxes and/or penalties. The total amount

collected in these audits exceeds $13 million. The IRS knows of a total 205 Participants in these Programs and estimates that, when all audits are completed, its recovery could exceed $70,000,000.

**E.      Defendant Knew, But Did Not Disclose, That its VEBA Programs Were Noncompliant**

68.     At all relevant times, Defendant knew, or in the exercise of ordinary care should have known, that its VEBA Programs were Listed Transactions and an unlawful tax avoidance scheme. For example, Sea Nine and Elliott were involved in early VEBA Programs promoted in the 1990s that led to determinations by the Tax Court that the Programs were an unlawful tax avoidance scheme. *See, e.g., Neonatology Assoc., P.A. v. Comm'r*, 229 F.3d 221 (3d Cir. 2002) (upholding one such Tax Court determination). At least one Participant from the 1990s sued Sea Nine and Elliott for RICO violations involving a pattern of racketeering activity almost identical to that allege herein. *Borah, et al. v. Monumental Life Insurance Company, et al*., U.S. District Court, E.D. Pa. Case No. 04-CV-03617-BMS, Dkt. No. 1 at ¶¶ 1, 16, 46-142 (RICO allegations in complaint filed July 30, 2004). Defendant knew from such experience that Plaintiffs would not obtain the claimed tax advantages and, in fact, would be forced to pay penalties, back taxes, and interest to the IRS as a result of their participation.

69.     Indeed, the following from the DOJ complaint applies with equal force here: "Significantly, the Neonatology case involved the participants in a Sea Nine-sponsored and promoted VEBA plan – thus evidencing the Defendants' persistent promotion of the tax scheme at issue in this case despite knowledge of its potential illegality for over 10 years."

70.     As noted in the DOJ complaint, Sea Nine and Elliott continued to use the same Master Plan Documents after 2001 knowing that these documents did not comply with § 419A(f)(6) and that the results for early Participants were disastrous.

71.     In 2000, the IRS designated transactions like the VEBA Programs that Defendant marketed and sold as Listed Transactions. *See* IRS Notice 2000-15; see also IRS Notice 95-34. A Listed Transaction is a transaction that is the same as or substantially similar to one of the types of transaction that the IRS has determined to be a tax avoidance transaction, and must therefore be reported by participants to the IRS in accordance with specified regulations. I.R.C. § 6111(a) and (b); 26 C.F.R. § 1.6011-4. If not reported, the IRS imposes penalties on the taxpayer. Here, Defendant failed to disclose to Plaintiffs and the Agents that its VEBA Programs, including the SCMPA Program, are Listed Transactions that must be disclosed to the IRS.

72.     Moreover, in 2003, the Treasury Department tightened the regulations applicable to plans that purport to be multiple-employer plans under § 419A(f)(6). 26 C.F.R. § 1.419A(f)(6)-1. Defendant (acting through Robinson and Mordin) asked Lalat and Laban to demonstrate to Defendant that its VEBA Programs complied with these newly tightened regulations and they had selected attorney Bruce Ashton of the law firm of Reish Luftman Relcher & Cohen ("Reish") to conduct this review. That same month, Robinson e-mailed Lalat that Defendant was placing its VEBA Programs on an updated list of acceptable plans for placement of insurance products but that he still needed to see the compliance documents by January 2004.

73.     By January 2004, the Reish firm had completed its review and prepared a draft opinion letter concluding that Defendant's VEBA Programs did not comply with the new regulations under § 419A(f)(6). Shortly thereafter, the Agents sent this draft opinion letter to Defendant with a cover letter stating as follows:

> As you are aware, we have been developing a long-term alliance with AIG American General over the last 2+ years with the hopes of generating substantial business in the dynamic area of qualified multiple employer welfare benefit plans and eventually expanding the distribution channels

for our plans with the assistance of the Affluent and Corporate Markets Group and its agents.  Because of our interest in a stable long-term strategic alliance with your group, we wanted you and your agents to be comfortable and supportive of our programs. In order to facilitate this, we decided to engage a major law firm ... whose opinions were highly regarded by AIG.... Consequently, because of our discussion with you and David Robinson ... we decided to engage Reish Luftman Relcher & Cohen ("Reish")—a firm that was already of counsel to your company ... As a result of the final 419 regulations which were released in 2003, we felt that Reish should evaluate the structure and operations of our programs in light of these regulations to ensure continued compliance. We also wanted them to reaffirm that we are a plan under ERISA as currently operated. Both of these items are very significant in sustaining the deductibility of employer contributions to our program. They are also critical to differentiating our programs from the non-qualified "419" plans which claim that they do not fall under the guidelines, and therefore do not have to meet such standards and restrictions.[] As you can see, Reish's opinion is to the contrary ... We have attached herewith the initial draft letter provided by Reish.

74.     The attached Reish law firm draft letter stated that Elliott, on behalf of Sea Nine, asked Reish "to address whether the several [VEBAs] administered by Sea Nine Associates conform to the requirements set forth in Treasury Regulations under Internal Revenue Code" or were exempt from those regulations. Reish first concluded that "[b]ecause the Plan and Trust do not contain provisions required under the new 419 Regulations, the VEBAs do not currently meet the requirements of the 419 Regulations." Reish also concluded that the VEBAs were not exempt from the regulations.

75.     These same conclusions were reflected in a final version of this opinion letter dated January 27, 2004. Reish made several suggestions to make these plans compliant, which Defendant ultimately ignored.

76.     On January 30, 2004, IPS sent a letter to Mordin stating that in light of the opinion letter from Reish, the Agents would amend "[o]ur plan documents and some operational aspects of our program ... accordingly" and that the Agents would "notify [AIG] of the changes and make available the final documents resulting from their recommendations—when they

become available." The letter also stated that IPS planned "on maintaining an "open book approach, and making transparent to your team, any structural, operational and documentation changes that Reish recommends." In fact, the Agents never followed through with these promises. Robinson has testified in another action that he warned Imhoff and Mordin that the Agents had not done so. But Defendant took no further action to ensure compliance with federal tax law and continued to sell Policies, including to Plaintiffs.

77.     In summary, Defendant knew that its Programs were noncompliant. Yet Defendant continued to market its VEBA Programs and falsely represent to its Agents and Participants that (a) the Programs fully complied with federal tax law, (b) the Programs were not Listed Transactions requiring notice to the IRS, and (c) contributions were tax-deductible. Further, Defendant continued to market and sell its Policies even after very senior executives, including Imhoff, Robinson and Mordin, knew that the VEBA Programs failed to comply with § 419A(f)(6) and related regulations.

**F.     Plaintiffs' Participation In A VEBA Program**

78.     Defendant, using its Agents, promoted its VEBA Programs mostly to high-income professionals who own small, closely-held companies, such as the Plaintiffs.

79.     IPS e-mailed Agents a packet of marketing material as part of a common marketing plan. Attached to the e-mail was a lengthy description of VEBA plans prepared by IPS and trade association bulletins entitled "IRS Loses Major Case on Funding Welfare Benefits" and "IRS Rules that Employer May Deduct VEBA Contributions Used to Purchase Life Insurance." Also included was a document on IPS stationary that prominently displays Defendant's logo, and includes the following representations:

> IPS successfully identifies, structures and implements innovative programs that allow high net worth individuals to dramatically reduce their taxes and enhance

their overall tax efficiency. [¶] Our team consists of in-house experienced professionals including MBAs, attorneys, and registered financial consultants. We also work closely with outside legal, actuarial and accounting experts, as well as the advanced planning divisions of major financial institutions . . . . [¶] IPS has teamed with some of the strongest, and most well-respected global financial institutions to offer clients world-class . . . advanced planning services. Over the past 25 years, IPS has developed relationships at the highest levels of these partner organizations . . . . Further, IPS works with some of the largest and most reputable law firms in the country to ensure that programs offered through IPS are structured properly . . . . [¶] Our high impact programs are backed and used by experienced law firms, actuarial firms, and accounting professionals. All of the programs offered by IPS have written Determination Letters from the IRS or written opinion by a major law firm(s) [sic.] with expertise in the area of law opined on . . . . [¶] Our Welfare Benefit Trust Programs can provide your business or practice a substantial tax deduction into an IRS-qualified plan, while providing tax-favored benefits for you and any eligible employees. A few of the key benefits of adopting a WBT are: . . . [¶] IRS qualification (IRS Letter of Determination) assures security and tax advantages.

80.     As part of their common marketing plan, Defendant also e-mailed the Agents copies of legal opinions and IRS correspondence to induce the Agents into believing that the VEBA Programs complied with § 419A(f)(6). This included an IRS "Favorable Determination Letter" dated August 1, 1988, an October 2, 1998 IRS "no change" letter, and an extensive opinion letter from an attorney named Frederick A. Romero.

81.     But Defendant deliberately withheld the January 27, 2004 Reish letter, which concluded that Defendant's VEBA Programs did not contain certain provisions required under the new regulations under § 419A(f)(6) and, therefore, were not compliant. Thus, the Agents did not know that the claimed tax advantages were illusory.

82.     Defendant routinely explained its Programs to the Agents as follows:

a.     A small, closely held business joins one of the VEBA Programs and purchases specialized whole life insurance Policies for its owner(s) (and perhaps other employees as well).

b.      The VEBA Program is the policyholder of record for the Policy(ies) and holds it/them for the benefit of the owner(s).

c.      The business makes five annual, supposedly tax-deductible contributions to the Program, which uses those contributions to make premium payments to the Insurer.

d.      Initially, the Program is the named beneficiary under each Policy and would receive any benefits that might be paid, but the owner designates those to whom the Program would, in turn, pay the benefits.

e.      After five years, the Program: (i) allows the business to exit the Program if it encounters "adverse business conditions," a purposefully lenient contractual standard that any business can properly meet and that Plaintiffs did meet; (ii) transfers ownership of the Policy(ies) to the owner(s); and

f.      Issues a 1099 to each owner based on the surrender value of their Policy. To keep the tax liability low, the Policies were designed with low surrender values.

g.      Each owner holds their Policy in his or her name for another two years. Then, on the first day of the eighth year, the Insurer allows the owner to exchange his or her Policy for one with a higher cash value and a lower death benefit. The Insurer agrees in advance that the exchange can be made without penalty (i.e., the surrender value would equal the amount of the premiums made).

h.      Each owner may then borrow against or even cash out of the new policy, supposedly on a tax-free basis. Because the new policy has a higher cash value (at the cost of a correspondingly lower death benefit), the amount available to the owner to withdraw is significantly higher than under the original Policy.

83.     Based on Defendant's negligent and false representations and its concealment of material information, the Agents believed that the Policies provided significant tax advantages when purchased through one of Defendant's Programs. Specifically, based on Defendant's representations, the Agents believed that the contributions were tax-deductible to the businesses in the year made, and that the owners could withdraw significant benefits on a tax-free basis after the exchange on the first day of the eighth year.

84.     On July 10, 2006, Lalat e-mailed Sierk that he could obtain a "VEBA Plan Design / Proposal" from IPS by filing out an IPS form entitled "Welfare Benefit Census" and faxing it to 310-388-0508, the fax number listed for IPS. The next step, Lalat explained in this e-mail, was to fill out a "Client Confidential Information Form" and that the clients would then receive "customized VEBA plan documents within 3-4 business days." Notably, the end of the latter form was pre-filled out to indicate that Defendant Innovative was the agent. The e-mail explained that this form too should be faxed to 310-388-0508 when completed. Both of these forms were attached to the e-mail, as was a third form entitled "AIG / American General / Part A Life Insurance Application."

85.     Lalat's July 10, 2006 e-mail to Sierk and other Agents also attached informational documents purporting to establish the legality of Defendant's VEBA Programs. One, from AIG itself and entitled "AIG Advisor Group Insurance Services Division Sales Insight," stated that the IRS had recently ruled that a company could properly deduct contributions to a VEBA program used to purchase life insurance policies. Lalat e-mailed this same document to Sierk again in November and December 2006.

86.     Defendant e-mailed a proposal to Sierk and other Agents. One proposal, dated July 31, 2006, stated among other things that: (a) Defendant's VEBA Programs had the "Support

of Substantial Legal Authority"; (b) "the Amount You Contribute Will Be 100% Tax Deductible"; (c) those amounts will be "Deferred in a Safe, Creditor Proof, Tax Exempt Environment"; and (d) participation in the Program meant "Substantially Reducing Income and Estate Taxes." In reliance on Defendant's and its Agents' false or negligent statements, material misstatements, and material omissions, Plaintiffs agreed to join the SCMPA Program and purchase Policies for Plaintiffs.

87.     On August 6, 2006, Elliott sent Sierk an e-mail (copied on Mordin and Lalat) in which Defendant quelled Sierk's stated concern that these were Listed Transactions such that his clients would have to report their participation to the IRS. This e-mail concluded with the following statement by Defendant: "We believe that the VEBA's sponsorship of the ten or more employer plan using this deduction established that we are not a tax shelter."

88.     On or about October 16, 2006, Defendant sent some Agents and Plaintiffs a set of Master Plan Documents to sign via U.S. Mail. The cover letter was signed by Elliott, noted that copies were sent to Laban and IPS, and included this statement: "Enclosed you will find the completed signature pages which Laban Pattanaik asked us to prepare for your review." The enclosed documents underscored the fact that these documents were prepared by Defendant. One included the notation "© Sea Nine Associates." Another was printed on stationary bearing the name "Sea Nine Associates," included Sea Nine's logo, and was signed by Elliott. Some Plaintiffs signed where requested and thus joined the Program.

89.     Plaintiffs made contributions into Defendant's VEBA Program by mail and/or wire transfer(s), including, but not limited to:

      a.      IAS made five (5) contributions of $100,000.00 each to the SCMPA Program under Policy No. A1E050082C with <u>Dr. Asokan</u> as the Insured totaling

approximately $500,000.00.   Plaintiffs reserve the right to amend these figures as discovery is ongoing.

b.      CRPA made five (5) contributions of $175,000.00 each to the SCMPA Program under Policy No. A10222488C with <u>Dr. Raghavan</u> as the Insured totaling approximately $875,000.00.   Plaintiffs reserve the right to amend these figures as discovery is ongoing.

c.      CRPA also made five (5) contributions of $25,000.00 each to the SCMPA Program under Policy No. A1E050023C with <u>Dr. Raghavan</u> as the Insured totaling approximately $125,000.00.   Plaintiffs reserve the right to amend these figures as discovery is ongoing.

d.      NPPC made five (5) contributions of $250,000.00 each to the SCMPA Program under Policy No. A10222477C with <u>Dr. Pidikiti</u> as the Insured totaling approximately $1,250,000.00.   Plaintiffs reserve the right to amend these figures as discovery is ongoing.

e.      RPPA made five (5) contributions of $100,000.00 each to the SCMPA Program under Policy No. A1E050071C with <u>Dr. Parekh</u> as the Insured totaling approximately $500,000.00.   Plaintiffs reserve the right to amend these figures as discovery is ongoing.

f.      FIM made five (5) contributions of $161,091.00 each to the SCMPA Program under Policy No. A10221980C with <u>Dr. Reddy</u> as the Insured totaling approximately $805,455.50.   Plaintiffs reserve the right to amend these figures as discovery is ongoing.

g.      FIM made five (5) contributions of $ 38,909.00 each to the SCMPA Program under Policy No. A10207935C with <u>Ms. Reddy</u> as the Insured totaling approximately $ 194,545.00.   Plaintiffs reserve the right to amend these figures as discovery is ongoing.

h.      TPP made multiple contributions of nearly $1,000,000.00 to Defendant's VEBA Program with <u>Mr. Lodge</u> as the Insured.   Plaintiffs reserve the right to amend this figure as discovery is ongoing.

90.    Plaintiffs discovered the true nature of the VEBA Programs in late 2011 when the IRS assessed taxes, interest and penalties against the Plaintiffs for the years listed below in the following breakdown, which Plaintiffs reserve the right to amend as discovery is ongoing:

a.      IAS, Dr., and Ms. Asokan were assessed a grand total of $1,254,274.14 in taxes, interest and penalties pursuant to 26 U.S.C. § 6706A (failure to report a Listed Transaction) for the years of 2008 through 2009;

b.      CRPA and Dr. Raghavan were assessed a total of $451,450.22 in taxes, interest and penalties under 26 U.S.C. § 6707A for 2010;

c.      NPPC and Dr. Pidikiti were assessed a total of $688,079.92 in taxes, interest and penalties under 26 U.S.C. § 6707A for 2008 through 2009;

d.      RPPA, Dr., and Ms. Parekh were assessed and settled with the IRS for a total of $160,000.00 in taxes, interest and penalties under 26 U.S.C. § 6707A for 2008 through 2009; a

e.      FIM, Dr., and Ms. Reddy were assessed approximately $363,567.68 in taxes, interest, and penalties for 2008; and

f.      TPP, Mr. Lodge, and Ms. Paulshock were assessed approximately $604,314.15 in taxes, interest, and penalties under 26 U.S.C. § 6707A for 2008 through 2009.

91.     Prior to these final assessments, Plaintiffs did not know and had no reason to know that Defendant had engaged in wrongdoing or that they had been injured by the conduct alleged in this Complaint.

92.     In addition to the IRS penalties listed above and the contributions into the VEBA Program, Plaintiffs have incurred legal and accounting fees, lost investment opportunities by putting their money in the VEBA Program, to which they now have no access, among other damages to be proven at trial. Further, Plaintiffs are likely to face additional tax liabilities in the future that they would not have incurred but for Defendant's negligence and wrongdoing.

93.     Defendant knew, or should have known, that none of its VEBA Programs, including the SCMPA Program, complied with provisions of federal tax law that supposedly provided the tax advantages that Defendant claimed. Defendant negligently and/or intentionally failed to disclose this information. Despite knowledge of the noncompliant nature of its Programs, Defendant continued to make representations that the VEBA Programs were compliant to Plaintiffs.

94.     Defendant, which designed its Policies to be used in conjunction with these VEBA Programs and actively participated in the Agents' marketing efforts, knew or should have known that its agents were marketing and promoting these Programs as a tax-avoidance transaction. However, even after Defendant received actual notice of the noncompliant nature of these Programs, Defendant knowingly and willingly continued to participate in this fraudulent scheme and continued to derive profits at Plaintiffs' expense.

95.     Defendant engaged in the wrongful conduct alleged herein and utilized the Agents to induce Plaintiffs to join its VEBA Programs and buy the Policies, which Plaintiffs would not have done had they known the true facts. Defendant knew, or should have known, that Plaintiffs were ignorant of the true facts at all relevant times.

**G.    Defendant Used A Common Marketing Plan And The Same Modus Operandi**

96.     Defendant used a common marketing plan and the same basic modus operandi to promote its VEBA Programs and sell AIG Policies to persons who suffered similar damages. *See, e.g., United States of America v. Kenneth Elliott, et a*l., U.S. District Court, C. D. Cal. Case No. 13-CV-01582-JLS-JPR, Dkt. No. 1 at ¶¶ 3-4, 16, 33-99 (alleging a common scheme); *J & M v. Callahan, et al.*, U.S. District Court, S.D. Ala. Case No. 07-CV-00883, Dkt. No. 1, at ¶¶ 8-16, 21-28 (alleging a similar sequence of events in 2004 to 2006 in a complaint filed against AIG, Lalat, IPS, and others); *Smith, et al. v. Elliott, et al.*, Hawaii Circuit Court, First Circuit, Case No. 09-1-2282-10 KKS, First Amended Complaint filed 2/24/2011 at ¶¶ 24-69 (alleging a similar sequence of events against Innovative, IPS, Laban, Lalat, Sea Nine, Elliott).

**H.    Florida Statutes Regarding Concealment and Misrepresentation in the Sale of Insurance Policies**

97.     Defendant had a duty to communicate to the Agents and to Plaintiffs in good faith, all facts within its knowledge which were material to the contract. *See* Fla. Stat. § 626.9541 providing that false advertising of benefits of an insurance policy are prohibited. There is no possible way that Plaintiffs could have discovered the opinion letter from the Reish law firm and other facts because Defendant failed to disclose it.

98.     Pursuant to Florida Statute § 626.99275, Defendant's concealment of material information and false advertising regarding the Policies, as alleged elsewhere in this Complaint,

constitutes unfair competition, and grounds for damages whether the concealment was intentional or unintentional.

## FIRST CAUSE OF ACTION
### RICO (Fla. Stat. §§ 895.01-895.06) and Civil Remedies for Criminal Practices Under Fla. Stat. §772.104

99.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

100.    In violation of Florida Statutes §§ 817.03, 817.19, 812.014, 817.41, 772.103, 626.9521 and 626.9541, Defendant and the Employees, through the Agents and by their words and/or actions, objectively manifested an agreement to participate, directly and/or indirectly, in a systematic, ongoing course of conduct and thereby conspired with, aided and abetted, encouraged and facilitated one another to commit the conduct alleged in this Complaint.

101.    Defendant and the Employees, through the Agents and by their words and/or actions, objectively manifested an agreement on the common purpose of this enterprise, *i.e.*, the sale of participation rights in their VEBA Programs, the sale of Policies through fraudulent means and/or a pattern of racketeering activity, and the reinvestment of the proceeds of that misconduct in their common enterprise.

102.    Further, Defendant and the Employees, through the Agents and by their words and/or actions, objectively manifested an agreement to perpetrate this scheme through predicate acts amounting to a pattern of racketeering activity. Defendant and the Employees agreed to commit predicate crimes, aid and abet the commission of predicate crimes by other members of the enterprise, and/or that some members of the enterprise would commit the predicate acts for the benefit of all members and/or the enterprise.

103.    As more fully alleged elsewhere in this Complaint, Defendant and the Employees have used the Agents to conduct this enterprise on an ongoing basis since 2001 or 2002, if not earlier. Through the conduct of this enterprise, Defendant and the Employees have used the fraudulent means alleged herein to convince at least 205 entities and/or individuals to participate in their VEBA Programs and purchase Policies through those Programs. Defendant and the Employees reinvested the proceeds of this scheme to defraud in the continuing enterprise.

104.    Defendant and the Employees participated in the conduct of this enterprise in furtherance of a common purpose that Defendant and the Employees agreed upon – the sale of participation rights in Defendant's VEBA Programs and the sale of Policies through material misstatements and material omissions, and the reinvestment of the proceeds of that misconduct in the continuing enterprise.

105.    Through explicit and/or tacit agreements, Defendant and the Employees agreed to function and did function as a unit and according to specified roles. Specifically, Defendant agreed with the Employees to sell Policies through the Programs, provide marketing material for both the Programs and the Policies, and to help market the Programs and Policies. Among other things, Agents Innovative, Lalat, IPS, Laban and others agreed with Defendant to take a role in marketing and promoting the Programs and Policies. Elliott and Sea Nine agreed with Defendant to assist in marketing the Programs and Policies and serve as the Administrator for the Programs.

106.    The conduct alleged in this Complaint was part of a scheme that Defendant and the Employees formulated to defraud Plaintiffs. Defendant and the Employees perpetrated this scheme with the specific intent to deceive and/or defraud Plaintiffs, and Defendant and the Employees did deceive and/or defraud Plaintiffs.

107.    Defendant and the Employees committed a continuous series of predicate acts of mail and wire fraud alleged in this Complaint in furtherance of this scheme. Among these predicate acts is the telephone call alleged above in which Mordin, a senior executive of Defendant, inter alia, urged Sierk and the Agents to recommend that their clients sign up for Defendant's VEBA Programs and purchase Policies through those Programs. Plaintiffs are informed and believe and on that basis allege that Defendant made similar use of the U.S. Mail and interstate wires to perpetrate fraud against all 205 Participants identified in the DOJ complaint. In addition, Defendant stole, embezzled, and/or misappropriated the contributions that Plaintiffs made to the SCMPA Program to cover premium payments, which conduct qualifies as another predicate act within the meaning of the Florida RICO statute. Fla. Stat. §§ 895.01-895.06, et seq.

108.    The predicate acts alleged in this Complaint constitute a pattern of racketeering activity within the meaning of Florida Statutes §§ 895.02(1)(a)(18) and 624.437(4)(c). Defendant's conduct, including the predicate acts and pattern of racketeering activity, amount to and/or pose a threat of continued criminal conduct.

109.    As a direct and proximate result of Defendant's wrongful conduct, Defendant caused harm and/or injury to Plaintiffs' business and property. Plaintiffs are entitled to recover treble damages, costs of suit and attorneys' fees.

## SECOND CAUSE OF ACTION
### *Common Law Unfair Competition Law*

110.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

111.    Defendant's actions constitute an unfair, unlawful or deceptive business practice.

112.    Defendant's conduct was deceptive and fraudulent in that Defendant's common marketing plan, which misstated material facts and failed to disclose material facts, was deceptive and likely to deceive Plaintiffs who were uniformly misled about the true nature of Defendant's VEBA Programs, the Policies, and the tax consequences relating thereto.

113.    Had Plaintiffs and their agents been aware of the material information that Defendant failed to disclose and the material misstatements of fact, they never would have agreed to join the VEBA Programs or purchase Policies through those Programs. Thus, as a result of Defendant's unlawful practices alleged above, Plaintiffs have suffered injury in fact and lost money or property.

114.    Defendant has derived substantial revenues from its wrongful and deceptive acts. Plaintiffs have been deprived of property to which they are entitled and/or in which they have a vested interest by means of Defendant's unlawful, fraudulent and unfair business practices. Plaintiffs are entitled to an order requiring Defendant to restore to Plaintiffs all the money or property which Defendant may have acquired by means of such unfair competition.

115.    As a direct and proximate result of Defendant's wrongful conduct, Defendant caused harm and/or injury to Plaintiffs' business and property. Plaintiffs are entitled to recover treble damages, costs of suit, and attorneys' fees.

### THIRD CAUSE OF ACTION
*Florida's Misleading Advertising Law (Fla. Stat. §817.41 et seq.)*

116.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

117.    Defendant intended to supply services in conjunction with its VEBA Programs and/or dispose of personal property.

118.    Defendant publicly disseminated advertising regarding its Programs and Policies that contained statements that were fraudulent, untrue and/or misleading. Defendant knew or in the exercise of reasonable care should have known, that this advertising falsely described its VEBA Programs, its Policies, and the tax consequences relating thereto and Plaintiffs would be induced to rely on an act upon such advertising.

119.    Defendant's statements constituted misleading advertising under Florida Statute § 817.40(5).

120.    Defendant has derived substantial revenues from its false advertising. Plaintiffs have been injured and deprived of property to which they are entitled and/or in which they have a vested interest by means of Defendant's violations of Florida's Misleading Advertising Law. Plaintiffs are entitled to an order requiring Defendant to restore to Plaintiffs all the money or property which Defendant may have acquired by means of such false advertising, including attorneys' fees, costs, and punitive damages pursuant to Florida Statute § 817.41(6).

121.    As a direct and proximate result of Defendant's misconduct and deception, Plaintiffs have been damaged in a sum in excess of the jurisdictional threshold of this Court, and in additional amounts to be determined at time of trial, including interest and costs.

### FOURTH CAUSE OF ACTION
#### *Fraud by Concealment*

122.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

123.    Defendant, directly and through the Agents, failed to disclose material facts to Plaintiffs and the Agents, including that: (a) participants in prior versions of Defendant's VEBA Programs were audited by the IRS, had their deductions disallowed and were forced to pay penalties, back taxes and interest; (b) that Defendant's VEBA Programs were Listed

Transactions that had to be disclosed to the IRS because they were the same or substantially similar to transactions determined to be unlawful tax avoidance schemes; and (c) Defendant's own lawyers advised them in writing that the Programs did not comply with §419A(f)(6). Defendant concealed this material information with the intent to induce Plaintiffs to join its Programs, purchase Policies, and make substantial payments to Defendant.

124.   Defendant engaged in, adopted and/or ratified the misconduct alleged in this Complaint with the intent to deceive Plaintiffs and with the knowledge that Plaintiffs would be deceived. At all relevant times, Defendant expected that Plaintiffs would rely, and knew that Plaintiffs did rely, upon the material omissions alleged herein.

125.   Plaintiffs reasonably relied on Defendant's failure to disclose material facts in agreeing to participate in Defendant's Programs, in agreeing to purchase the Policies, and in making the payments to Defendant. Plaintiffs would not have entered into the Adoption Agreements, purchased the Policies, or made substantial payments to Defendant had they known the true facts.

126.   As a direct and proximate result of Defendant's misconduct and deception, Plaintiffs have been damaged in a sum in excess of the jurisdictional threshold of this Court, and in additional amounts to be determined at time of trial, including interest and costs.

## FIFTH CAUSE OF ACTION
### *Common Law Fraud*

127.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

128.   Defendant, directly and through the Agents, made various misrepresentations of material fact to Plaintiffs as alleged above, and did so with the intent to induce Plaintiffs to join the VEBA Programs, purchase Policies, and make substantial payments to Defendant.

129.    Defendant engaged in, adopted and/or ratified the misconduct alleged in this Complaint with the intent to deceive Plaintiffs and with the knowledge that Plaintiffs would be deceived. At all relevant times, Defendant expected that Plaintiffs would rely, and knew that Plaintiffs did rely, upon the material misrepresentations alleged herein.

130.    Plaintiffs reasonably relied on Defendant's misrepresentations of material facts in agreeing to participate in the VEBA Programs, purchase the Policies, and make the payments to Defendant. Plaintiffs would not have entered into the Adoption Agreements, purchased the Policies, or made substantial payments to Defendant had they known the true facts.

131.    As a direct and proximate result of Defendant's misconduct and deception, Plaintiffs have been damaged in a sum in excess of the jurisdictional threshold of this Court, and in additional amounts to be determined at time of trial, including interest and costs.

### SIXTH CAUSE OF ACTION
*Aiding and Abetting*

132.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

133.    At all relevant times, Defendant knew that the conduct of the Agents, without full disclosure by Defendant, constituted violations of RICO and/or a breach of legal duties owed to Plaintiffs.

134.    Defendant utilized the Agents pursuant to a common design, gave substantial assistance or encouragement to the Agents' negligent, wrongful or unlawful conduct, and/or gave substantial assistance to the Agents in accomplishing a tortious result.

135.    Defendant's own conduct, separately considered, constituted a breach of duty to Plaintiffs.

136.    As a proximate and direct result of Defendant's aiding and abetting the Agents, Plaintiffs were damaged as alleged above and in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### *Violations of § 501 Part II Florida Statutes Deceptive and Unfair Acts or Practices*

137.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

138.    Defendant, in the course of trade and commerce, violated Part II of Chapter 501, Florida Statutes, relating to Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Section 501.204 of that Act prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

139.    Defendant violated FDUTPA by committing unconscionable and deceptive acts and practices.

140.    Defendant knew or should have known that the above actions were in violation of the Florida Deceptive and Unfair Trade Practices Act, Part II.

141.    Defendant's acts and practices alleged herein have and continue to injure and prejudice Plaintiffs.

142.    By reason of the foregoing, the Defendant violated § 501, Florida Statutes.

143.    Plaintiffs are entitled to damages and attorneys' fees and costs from Defendant who is liable pursuant to § 501.2105, Fla. Stat.

## EIGHTH CAUSE OF ACTION
### *Breach of Fiduciary Duty*

144.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

145.    This is an action for breach of fiduciary duty against Defendant for damages in excess of $15,000.00, exclusive of interest, attorneys' fees and costs.

146.    Defendant's Agents and Employees developed a personal, fiduciary and confidential relationship with the individual Plaintiffs.

147.    Defendant's Agents and Employees personally advised and represented to Plaintiffs that they should invest in the VEBA plan.  Plaintiffs reposed trust in Defendant.

148.    Defendant represented that they would provide Plaintiffs the highest level of fiduciary duty arising from their role as investment advisors and from their close and confidential business relationship.

149.    Defendant represented to Plaintiffs that Defendant would continue to provide personal advice and information regarding their investment.

150.    Defendant and its Agents and Employees held positions of confidentiality and mutual trust with Plaintiffs and voluntarily undertook and owed Plaintiffs a fiduciary duty to act in good faith for, on behalf of, and, in the best interests of Plaintiffs individually.

151.    Defendant and its Agents and Employees held a position of confidentiality and mutual trust with the Plaintiffs, and owed Plaintiffs a fiduciary duty to act in good faith for, on behalf of, and in the best interests of Plaintiffs.

152.    Plaintiffs reasonably and justifiably relied upon Defendant's and its Agents' fiduciary position, business experience, representations and promises in agreeing to invest in stock.

153.    Defendant violated its fiduciary duties to Plaintiffs individually and separate from their shareholders by engaging in multiple acts and/or omissions including, but not limited to, the following:

a.      Personally inducing Plaintiffs to invest more money while misrepresenting the tax statutes of VEBA; and

b.      Inducing Plaintiffs to invest while concealing the tax statutes of VEBA.

154.    Defendant also breached its fiduciary duties to the Plaintiffs by concealing from and failing to disclose the acts and omissions described above and their other negligent and/or fraudulent actions, conflicts of interest, and self-dealing.

155.    Plaintiffs have suffered damages as a result of Defendant's breaches of its fiduciary duties owed to Plaintiffs.

## NINTH CAUSE OF ACTION
### *Constructive Fraud*

156.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

157.    This is an action against Defendant for constructive fraud and for damages in excess of $15,000.00, exclusive of interest, attorneys' fees and costs.

158.    Defendant, through its Agents and Employees, occupied a confidential and fiduciary relationship with the Plaintiffs:

a.      due to their acting as investment advisors to Plaintiffs; and

b.      due to the development of a trusting relationship as Plaintiffs reposed trust in Defendant who accepted said trust.

159.    Defendant has engaged in fraud, self-dealing and concealment of their conflicts of interest to the detriment and at the expense of the Plaintiffs.

160.    In addition, Defendant occupied a fiduciary and confidential relationship with the Plaintiffs by way of its participation with the Plaintiffs in a confidential business plan and its personal inducement of Plaintiffs to invest in VEBA.

161.     As a result of the above-described fiduciary and confidential relationships, Defendant owed Plaintiffs a fiduciary duty and a duty of fair dealing with regard to all the business affairs involving VEBA.

162.     Defendant received a direct benefit from their fiduciary and confidential relationship with Plaintiffs, namely their money.

163.     As a result of the fraud, self-dealing, conspiracy and concealment of the conflicts of interest by Defendant, Plaintiffs have been denied the benefit of their investment.

164.     Defendant owed Plaintiffs individually a direct and continuing, fiduciary duty to deal in good faith for and on behalf of and in the best interests of the Plaintiffs.

165.     Defendant has received the benefits as a result of the fraud perpetrated upon the Plaintiffs through the present.

166.     Plaintiffs have suffered damages as a result of the breach of fiduciary duties and the violation of confidential relationships with Defendant by Defendant and by its diversion of Plaintiffs' investments.

## TENTH CAUSE OF ACTION
### *Negligent Misrepresentation*

167.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

168.     Defendant, through its Agents and Employees, made misrepresentations of material fact that it may have believed to be true.

169.     Defendant was negligent in making the misrepresentations as it should have known they were false.

170.     Defendant intended to induce Plaintiffs to rely on the misrepresentations.

171.     Plaintiffs justifiably relied on Defendant's misrepresentations and were injured.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray judgment against the Defendant, and each of them, as follows:

(1)     For special damages according to proof;

(2)     For general damages according to proof;

(3)     For attorneys' fees and costs according to proof;

(4)     For restitution of all monies paid to the Defendant according to proof;

(5)     For pre-judgment and post-judgment interest;

(6)     For a constructive trust be imposed on the assets, property, contracts, revenues, income and profits of Defendant to the extent of Plaintiffs' investments in the same;

(7)     For damages sustained as investors in VEBA; and

(8)     For damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated July 29, 2016

*s/Paul L. SanGiovanni*
Paul L. SanGiovanni
Florida Bar No. 0513164
MORGAN & MORGAN, P.A.
20 North Orange Avenue, Suite 1500
Orlando, Florida 32801
Telephone:  (407)418-6041
Facsimile:  (407)245-3394
Email:  psangi@forthepeople.com
*Attorney for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 29, 2016, I electronically filed the foregoing with the Clerk of the Court by using the Court's CM/ECF system, which will serve a notice to all counsel of record.

_/s/ Paul L. SanGiovanni_
Attorney